Argued January 11, affirmed February 15, 1956

# RITTER *v.* SIVILS

293 P. 2d 211

*Ronald W. Husk* argued the cause for appellant. On the brief were Harris, Butler & Husk, Eugene.

*Maynard Wilson,* Cottage Grove, argued the cause and filed a brief for respondent.

Before WARNER, Chief Justice, and ROSSMAN, LATOURETTE and PERRY, Justices.

ROSSMAN, J.

This is an appeal by the defendant, a chiropractic physician, from a judgment of the circuit court which was entered in a malpractice action and which awarded the plaintiff damages totaling $10,000. The judgment is based upon the verdict of a jury.

According to the complaint, the plaintiff employed the defendant in July, 1951, "to treat him for a mild external and internal hemorrhoid condition." The complaint contains the following specifications of its charges of negligence:

"1. Giving a caustic and sclerosing injection for the treatment of hemorrhoids, the type and severity of plaintiff's under the existing conditions.

"2. Failing to call a licensed physician to treat Plaintiff's condition when he recognized that chiropractic treatments were not indicated.

"3. In improperly giving injections so that the needle and caustic solution entered the muscles veins and tissues in the rectal area rather than the veins.

"4. In treating the Plaintiff with unsterile instruments and in an unsterile manner.

"5. In failing to treat or have the Plaintiff treated for the infected condition arising after the injections above mentioned were given."

The answer admitted that "during the summer of 1951 Defendant treated Plaintiff for a mild hemorrhoid condition." All averments of the complaint, with the exception of those which alleged that the defendant was a licensed chiropractic physician and that he treated the plaintiff for a mild hemorrhoid condition, were denied by the answer.

The defendant, in appealing, presents the following two assignments of error:

"The Court erred in denying the Defendant's Motion for an Order of involuntary non-suit made as follows: * * *."

"The Court erred in failing to give the following requested instruction: 'I instruct you to find your verdict in favor of the Defendant J. E. Sivils.'"

We omitted quoting the motion for an involuntary nonsuit because of its length. It mentioned, one by one, the specifications of negligence which are set forth in a preceding paragraph of this opinion, and in each instance succeeded the particular specification with a claim that it was not supported with evidence.

The evidence, as transcribed, covers 218 typewritten pages. Three physicians, including a specialist in proctology, testified in behalf of the plaintiff. The defendant, together with two fellow chiropractic practitioners and one medical physician, gave testimony for him. The medical practitioner whom the defendant called had special qualifications in the province of proctology.

We agree with the defendant-appellant that: (1) Malpractice actions are based upon negligence and that they do not differ in their essential elements from any other kind of action in which recovery is sought on charges that the alleged tort feasor failed to exercise due care. (2) The plaintiff in malpractice actions must establish negligence, injury and a relationship of proximate cause between the two. (3) A chiropractor is under a duty to treat a patient with reasonable care, and the criterion by which reasonable care is determined is the standard employed in the practitioner's locality. (4) A chiropractor is not a warrantor of cure, and if a good result does not ensue from his efforts the doctrine of res ipsa loquitur is not available to his erstwhile patient. (5) If the issue turns upon some fact beyond the ken of laymen, expert testimony must be produced showing that the practitioner's treatment fell below the standard of the profession and was the proximate cause of the condition for which the plaintiff seeks an award of damages. (6) If the evidence discloses two or more possible causes, for only one

of which the defendant is responsible, the defendant cannot be adjudged liable unless the evidence shows that the cause for which he is responsible is the more probable.

We cite no authorities in support of the above statements of the controlling legal principles because they have been many times enunciated by this court and their application to various fact situations is illustrated in our precedents. The plaintiff-respondent contests none of those principles and appellant's brief contains a collation of the decisions.

■■ It will be recalled that both the complaint and the answer alleged that the plaintiff came to the defendant with a mild hemorrhoid condition. However, as a witness, the defendant testified:

"Q And how did you classify his condition as to whether it was mild, severe or acute?
"A Well, it was a severe condition, * * * it had best be done by surgery."

The foregoing is an instance in which the defendant, as a witness, came into conflict with his own pleading. The record reveals several situations in which testimony given by him clashed with testimony given previously by the plaintiff. All of those conflicts, with the exception of the one about the pleadings, were, of course, for the jury's disposition, and since the verdict was for the plaintiff, it is evident that the triers of the facts accepted the plaintiff and his witnesses as the superior sources of the truth. Our duty does not require us to review the jury's action, but merely to ascertain whether or not the verdict is supported by substantial evidence.

The plaintiff was a sawmill worker, 40 years of age, when he called upon the defendant July 28, 1951, and

inquired whether or not the defendant could treat the plaintiff's hemorrhoidal condition. Upon that occasion the plaintiff was accompanied by his stepfather, Ralph Mansel, who had recently received from the defendant professional treatment. Before answering the plaintiff's inquiry, the defendant gave him an examination and at its conclusion replied, according to the plaintiff, that "my hemorrhoids weren't so bad but what he could take care of them with the injections." At that point the plaintiff asked the defendant concerning the injections and their purpose. The defendant, so the plaintiff swore, replied:

"He used a pen or a pencil, I would say about like that, about the size of a pen or pencil; and he said the hemorrhoids were up there, the highest of them, about that high; and he goes up about that far above them (indicating) and injects them all the way down."

Going on, the plaintiff testified that the defendant told him that

"this injection of fluid they used causes an irritation and that causes scar tissue, and that pulls the hemorrhoid tissue down and eliminates your hemorrhoids that way. * * * Each time he told me that the fluid he used and the injections caused an irritation and that causes scar tissue and peels it down—that is the only way I can explain it."

Upon cross-examination, the plaintiff gave the following additional account:

"In regards to that the explanation I can give you is that he illustrated with a pen or pencil, and then he said he starts injecting above that and works on down into the actual hemorrhoid itself. Well, he didn't say he put it in the hemorrhoid itself. But he said he starts above it I would say about an inch and injects the hemorrhoid on down the way I took it. The way he was speaking if you

got several hemorrhoids he went up to the top ones and he started his injections there and worked on down.

"Q  Did he indicate he was going to inject into the vein or into the subcutaneous tissue?
"A  He said into this vein itself."

The plaintiff's stepfather, the aforementioned Ralph Mansel, gave testimony similar to the plaintiff's. He, too, said that the treatments would consist of injections and that "the substance that he used would cause the scar tissue and draw that skin up—the hemorrhoidal vein." The plaintiff's wife accompanied the plaintiff upon some of his visits to the defendant's office and in the course of one of them inquired of the defendant as to the nature of the treatments. According to her, the defendant "told how far up he started these injections" and added, "This causes an irritation, and that causes scar tissue, and that is what pulls the hemorrhoid down."

The defendant expressed a belief, so the plaintiff testified, that three or four treatments would remedy his condition. The plaintiff was satisfied with the defendant's explanation and told him to proceed. He testified that the first treatment was given that day and that eight or nine more were given at intervals of about two weeks apart. The last occurred November 24, 1951.

The plaintiff described the treatments in this manner:

"He inserted an instrument into me, and then he used a hypodermic syringe and needle; and I had several hemorrhoids, and he injected—as near as I can remember he must have injected all of them because he gave me several injections.
        *    *    *

"They were just a little prick of the needle, and then it felt like, and then he raised it up, and I could feel this fluid running in.

"Q How did the fluid feel?

"A There wasn't no feeling to it only you could just feel it run in there. It didn't hurt."

According to the plaintiff, he felt a distinct improvement after the second or third treatment, and his impression was confirmed by the defendant who assured him that if any other practitioner examined him "they would hardly know you had any hemorrhoids." However, the defendant suggested, so the plaintiff swore, that he ought to take more treatments; the plaintiff yielded to the advice.

The plaintiff testified that none of the treatments, with the exception of the seventh which we will presently describe, caused the flow of any blood. He also testified that until after the seventh he lost no time from his employment and suffered no ill effects from any of them.

It will be recalled that one of the specifications of negligence charges that the defendant gave the treatments under unsanitary conditions. Although the testimony was contradicted by the defendant and his witnesses, the plaintiff and others swore that the covering upon which the patient lay while undergoing treatment was soiled and bore blood stains. They also swore that the defendant placed the instruments, which he inserted into the plaintiff, when they were not in use, in any convenient place without first covering the surface with a medical towel. The plaintiff testified that he began "to get swelled up and sore" after the fourth or fifth treatment. He also claimed that before long he developed a temperature and displayed indications of infection. A medical practitioner whom

he consulted in December, 1951, found that in addition to his "internal and external hemorrhoids" the plaintiff had "one small nodule of induration in the rectum" which was "extremely tender." The physician cauterized the nodule with an electric current and was required later to repeat the treatment when the nodule returned.

We will not pursue further the charge of unsanitary conditions because we believe that the plaintiff depends primarily upon his accusation that on October 27, 1951, while the defendant was giving him the seventh treatment he negligently thrust the needle of the hypodermic syringe into an improper place and in that manner injected the solution into the area of the perineal nerve.

October 27, 1951, the plaintiff received the seventh treatment. He claims that in its course the defendant acted negligently and that the negligent act committed on that day, together with the unsanitary methods employed by the defendant, caused the condition of ill health for which he sought damages. It seems clear that the plaintiff depends principally upon the events of October 27.

Before going on we will take note of the purpose and action of the fluids and solutions which are injected into hemorrhoid veins by practitioners who use the injection method of treatment. Such solutions are called sclerosing agents. Some physicians, including one who testified in this case, Dr. Marlowe H. Schaffner, refuse to use them. Dr. Schaffner swore that "the treatment of hemorrhoids by injection is not done nearly as much as formerly because of the difficulties that follow such treatments". All sclerosing agents are not composed of the same ingredients, but the testi-

mony warrants a belief that all have the same general purpose. The latter can be defined in this way: a sclerosing agent which is an irritant is intended to produce scarring and adherence between the two walls of the blood vessel into which it is injected. The scarring and adherence, if sufficiently extensive, will close the vein and thus prevent the flow of any more blood through it. One of the medical men expressed it this way:

"A sclerosing agent is an irritant which is given with a purpose of irritating or destroying a layer of tissue so that there will be adherence between the two walls of a vessel as it is in this case. And if it is placed where you don't want it, it is going to cause irritation there just as well."

The evidence indicates that if the injection is made in the right place the patient suffers no pain, but if it is misplaced it can cause suffering and injury. Dr. Clifford E. Hardwick, of Portland, a proctologist, declared that if the injection is made "above what we call the inter-rectal line" no pain or injury will be experienced. He explained that "people don't have pain in that area." But he added that if an injection is made below that line pain occurs. Some practitioners, according to his observations, "inject directly into the hemorrhoidal mass, others above so that you set up an inflammatory process in the vein." In any event, the injection is made into the vein and not into areas beyond them. We quote again from him:

"Q Would you say that the giving of an injection outside of the hemorrhoidal area in nerves and tissues is good or bad practice in any field?

"A I don't think it is good therapy, if that was done. I don't see how he caught the guy before he got to Cottage Grove. Gee, that hurts."

The plaintiff lives in Cottage Grove and the defendant's office is in Eugene. We now continue the interrupted quotation:

"Q That is a painful situation?

"A Ordinarily if you inject in before the inter-rectal line this area (indicating) shouldn't hurt; and if the injection is given too low you encounter pain. But if you stay in the area above you can burn, cut and stick anything up there and the pain— the patient does not have pain. The pain usually means it is going somewhere where the doctor hadn't planned on it."

The second specification of negligence charges the defendant with having failed to call a physician "when he recognized that chiropractic treatments were not indicated." ORS 684.110, which defines permissible chiropractic practice, says:

"* * * (3) No person practicing under this chapter shall administer or write prescriptions for, or dispense drugs, * * *."

The uncontradicted and unchallenged testimony of a physician follows:

"Q Doctor, is the giving of a sclerosing agent a medical technique?

"A A medical technique?

"Q Yes.

"A I think it is a surgical treatment. You could call it a medical.

"Q Does it involve the use of a drug?

"A Yes."

The plaintiff depends upon the above to establish the second specification of negligence. We believe that the specification was established.

We turn now to the treatment which was given October 27, 1951, the seventh in the series. The plaintiff testified that as the defendant was preparing to

give that injection he inquired of the plaintiff as to the whereabouts of Ralph Mansel, the plaintiff's step-father, whom we have mentioned. It seems that Mansel was indebted to the defendant. The plaintiff replied that Mansel had moved to California and thereupon, according to the plaintiff, the defendant displayed anger and denounced Mansel's failure to pay his account as "a dirty-dam trick." As he uttered those words the defendant made the injection and in doing so, if the plaintiff told the truth, "he just run the needle in me, and I don't know how deep." The plaintiff immediately experienced excruciating pain, according to his testimony. Simultaneously he made an outcry of pain. His wife, who was beyond a closed door in the reception room, swore that she heard the exclamation. The plaintiff testified that he at once protested, "That hurts terrible." We quote from him again:

"Q  Well, did he at the time—did he complete the injections, or—

"A  Yes, he give me several injections at that time, but they was all rough. He wasn't taking the pains that he had before. He was mad at this gentleman that owed him for some treatments and moved out of the state.

"Q  Would you describe how you felt at the time he gave you this injection?

"A  Yes, just had—the injection pained terrible, and burnt terrible.

"Q  About where was that located? .

"A  It was on the left half of my rectum.

"Q  And did it feel like it was inside or outside, or what location as far as in and out?

"A  It felt it was inside of my rectum."

The plaintiff, referring to the treatment of October 27, declared: "There was quite a lot of blood after he give me the injection."

Both the plaintiff and his wife testified that although the former had driven their car home after the previous treatments, he was unable to do so after the treatment of October 27. Upon that occasion, according to their accounts, Mrs. Ritter drove the car and the plaintiff reclined in the rear seat. Likewise, the two testified that up to October 27 the plaintiff had worked steadily in a sawmill, but that he was confined to his bed for a week after the treatment which he received on the 27th.

A week or two after October 27 the plaintiff returned to the defendant's office. According to his testimony, he was in constant pain, had trouble sleeping and was "swelled up pretty bad." The defendant, nevertheless, gave him another treatment. Concerning it, the plaintiff said:

"* * * He couldn't get the instruments up into me, and I asked him what was the matter, and he said, 'There is some foreign body there.' And he finally got the instrument in me. And I said, 'Well, what is the foreign body?' And he says, 'It is a thrombolic blood clot.' And he tried—he give me injections with this one instrument—and this one he had up in the first was a long one. Evidently, the hemorrhoids up higher he was injecting those, and then he couldn't get into some place right, and he said he would have to use another instrument.

"He used a smaller one, and these blood clots— with the smaller one he was squeezing that. He said he couldn't get the blood clot out. And then he give me injections lower down with this while he was using this smaller instrument—the shorter one.

"Q Had you lost any blood?

"A I bled when he hurt me the time that he hurt me the injection prior to that. I bled. That is the only time I saw blood. There was quite a lot

of blood after he give me the injections when he hurt me. And then he—it felt like he was digging at these blood clots with the hypodermic syringe and needle because it was a sharp instrument he was digging at it with. And he said he couldn't get it out, and he shook his head.''

The plaintiff swore that after he had returned home from the treatment of October 27 he decided to take no more, but that he was dissuaded from quitting when the defendant told him that if he abandoned the course ''your whole rectum would become inflamed and infected.''

December 11, 1951, the plaintiff consulted Dr. Marlowe H. Schaffner, a physician and surgeon, whose office is in Cottage Grove, the same city in which the plaintiff lives. He remained a patient of Dr. Schaffner for several months and then went under the care of some medical men in Portland. One of them performed an operation upon him for the removal of hemorrhoids and inflamed crypts. At the conclusion of the treatment which he received from the Portland specialists, one of them ordered for him a course of massage and medication which was thereupon administered to him in Cottage Grove by Dr. Schaffner. He was also placed upon a diet and subjected to other regimen upon the orders of the Portland physicians.

At the time of the trial the plaintiff complained that he was still suffering from pain and that the latter denied him adequate sleep. The physicians were unable to predict the time ahead when the pain would disappear. The plaintiff lost 155 days from his employment subsequent to October 27, 1951, due to inability to work.

Although the plaintiff, his wife and his stepfather gave the testimony reviewed above which indicates

that the defendant explained to them that in his treatment of the plaintiff he would inject into the hemorrhoidal veins an irritant capable of making the walls of the vein develop scar tissue and adhere to each other, the defendant, as a witness, not only denied that he made the explanation, but also denied that he used any sclerosing agent whatever in his treatment of the plaintiff. According to his testimony, he injected into the plaintiff no irritant and did not seek to develop scar tissue or adherence. He swore that he injected into the plaintiff's hemorrhoidal veins nothing except "a two per cent solution of novocaine." He described it as harmless. His treatment of the hemorrhoidal condition, as he related it, consisted of injecting the solution of novocaine into the vein and then of drawing from the ballooned vein excessive blood and blood clots. He made the withdrawals, according to his explanations, by massage and used in that connection an electric needle which he termed a fulgerator. He claimed that each treatment, of necessity, caused an appreciable amount of blood to flow. He swore that he never employs a sclerosing agent and keeps none in his office. However, upon cross-examination, he admitted that when he gave testimony upon a pre-trial deposition he swore that "I use a caustic solution sometimes on external parietitis. I may have used some on Mr. Ritter, I am not sure."

The defendant testified that nothing unusual happened in the course of the treatment which he administered October 27, 1951, and denied that the plaintiff made any exclamation of pain on that occasion. He also testified that the plaintiff left the treatment room on that day without pain or inconvenience. Further, the defendant denied that he spoke to the plaintiff on October 27 concerning Ralph Mansel and, likewise, de-

nied that anything untoward occurred during the treatment.

We see from the foregoing that the trial developed a sharp disagreement concerning the basic facts. The defendant made no effort to indicate that an injection of a sclerosing agent into any part of the human anatomy except the veins is good practice. Likewise, he made no effort to account for plaintiff's present condition.

Dr. Hardwick, whom we have mentioned, expressed a belief that "this man has a nerve irritation, and he has nerve pain; and I am convinced he has pain and true symptoms, I have watched this fellow carefully."

■ Based upon the facts which are sketched in preceding paragraphs, hypothetical questions were submitted to the practitioners, both medical and chiropractic. We believe that the answers which were made by those witnesses justified the jury in finding that the defendant's treatment of the plaintiff was negligent and that the negligence committed in that way was the proximate cause of the plaintiff's present condition. We shall give one or two quotations from the answers made by the physicians. Dr. Hardwick answered:

"* * * Then in the course of treatment there is apparently a complication. Now, is the complication the cause of this man's perineal nerve irritation? I can only say it is a possible complication.

"Q Would you say it is a probability?
"A Yes, I can say that, honestly."

Dr. Schaffner testified:

"* * * And it was my feeling at first, when I saw him, and subsequently also, that some of this sclerosing solution had been placed outside of a vein with subsequent scarring and irritation in this area. That is what I thought the first time. * * *

My feeling about his distress now is that he has no visible signs in the rectum of difficulty; and that his pain is due to the old injury; and that the reason it has persisted this long is because it effected [sic] the nerves on that area, and he now has muscle spasm; and not that there is any rectal pathology as such at the present time. In view of that, he might continue to have pain over quite a length of time."

Dr. Stanton G. Oberg, who had attended the plaintiff for a period of six weeks, testified:

"My supposition was that the injection of a sclerosing agent had probably been used, and the needle had gone outside the vein causing a small area of sluff.

"Q Is that a condition which can easily occur, or can occur in giving these injections?

"A It certainly can occur in giving these injections.

\* \* \*

"Q Doctor, considering that these facts are true, just supposing that they are, would you say that the injection of the fluid into the area outside the hemorrhoids is good medical practice?

"A No.

"Q Would you say that—what would you say from that that the cause of the pain and suffering which is continuing into this time might be?

"A It could be due to the reaction of the sclerosing agent outside of the vein wall.

"Q Would you say it is most probably due to that?

"A Yes."

It follows from the above that the trial judge committed no error when he made the rulings which are challenged by the assignments of error.

The judgment of the circuit court is affirmed.