Argued September 7, affirmed October 5, 1960

# CREWSE *v.* MUNROE
355 P. 2d 637

■■■■■■■■■■■■■■■■
■■■■■■■■■■■■■■■■■■■■■■■■
■■■■■■■■■■■■■■■

*Clifford B. Olsen,* Portland, argued the cause for appellant. With him on the brief were Anderson, Franklin & Jones, Portland.

*Cleveland C. Cory,* Portland, argued the cause for respondent. With him on the brief were Hart, Rockwood, Davies, Biggs and Strayer, Portland.

Before McAllister, Chief Justice, and Rossman, Perry, Goodwin and King, Justices.

PERRY, J.

This is an action to recover damages for personal injuries. The plaintiff was a patient of the defendant, a practicing physician, and claims his injuries are due to negligence. The claim of malpractice is based upon the administration by the defendant of an anesthetic. At the close of the plaintiff's case the defendant moved for an involuntary nonsuit, which was granted, and the plaintiff appeals.

■ Since the motion for an involuntary nonsuit challenges the legal sufficiency of the plaintiff's evidence, we must consider his evidence in a light most favorable to him. *Phillips v. Colfax Company, Inc.,* 195 Or 285, 243 P2d 276, 245 P2d 898.

The record discloses plaintiff was suffering from hemorrhoids; that he submitted himself to the defendant for a hemorrhoidectomy; that an anesthetic was administered and the operation performed; that following the operation the plaintiff was paralyzed from the waist down and suffered injuries that are prob-

ably permanent; that the paralysis of plaintiff is due to arachnoiditis, an inflammation of the arachnoid membrane. This membrane is located immediately within the dura, the heavy outside covering of the spinal canal.

The record further discloses that in administering the anesthetic in question the defendant's object was to anesthetize the areas supplied by the motor and sensory nerves stemming from the sacral and lumbar regions (the lower portion of the back). The desired result may be accomplished either by administering an anesthetic in the sacral canal, which is located between the coccyx (tailbone) and the subarachnoid space, or by administering an anesthetic in the subarachnoid space, which contains the spinal cord. The subarachnoid space begins a few inches above the coccyx and continues up the backbone toward the head. The former procedure is called a "caudal block"; the latter, a "spinal." Different strengths and types of drugs are used for each. The defendant stated that he intended to and did administer a caudal block in the instant case. The use of the caudal block is good medical practice. A caudal block anesthetic is to operate "extra dural," that is, it is not intended that the injected fluid should enter the subarachnoid space.

It is the contention of the plaintiff that the negligence of the defendant consisted of directly introducing into the subarachnoid space the caudal anesthetic which induced the arachnoiditis. It is admitted by the plaintiff that there is no direct evidence that the defendant did inject the anesthetic into the subarachnoid space. The plaintiff, however, contends that the circumstantial evidence is sufficient to establish a presumption of this fact. *Clemens v. Smith,*

170 Or 400, 134 P2d 424. His argument may be summarized as follows:

(1) After the operation the plaintiff suffered from an arachnoiditis; (2) the arachnoiditis occurred because of the caudal anesthesia; (3) the defendant administered the anesthesia; (4) the direct introduction of a caudal anesthesia into the subarachnoid space is bad practice and can produce arachnoiditis; (5) therefore, a presumption may arise that the defendant was negligent and did inject this space.

■ The difficulty with this argument is that a physician is not a warrantor of a cure. His liability rests solely on accountability for his negligent or wrongful acts. *Ritter v. Sivils*, 206 Or 410, 293 P2d 211.

■ If the evidence in a case discloses two or more possible causes for an injury, for only one of which a defendant is responsible, liability does not attach unless the evidence discloses that the cause for which he is responsible is the more probable. *Eitel v. Times, Inc.*, 221 Or 585, 352 P2d 485; *Ritter v. Sivils*, supra; *Simpson v. Hillman*, 163 Or 357, 97 P2d 527.

A physician who had examined the plaintiff was called by the plaintiff as an expert witness and testified on direct examination as follows:

"Q Now, Doctor, you mentioned that there was a high protein in the spinal fluid at the time of this examination?

"A Yes.

"Q And what would cause the high protein?

"A Well, we puzzled about this a good deal. My final conclusion, after a considerable amount of study, was that the high protein and the relatively low cells in the spinal fluid possibly was due to the fact that the response on the part of the patient to the caudal anesthesia was located out-

side of the subarachnoid space but that the inflammation that it generated affected capillaries and blood vessels which extended through around these nerves as they traversed the subarachnoid space, and any time one has an inflammation in blood vessels the smaller blood vessels, the capillaries, become more permeable to protein in the blood and protein is then diffused out, and this was our explanation finally as to why this spinal fluid had this peculiar characteristic of such a tremendously high protein and a relatively small cellular reaction.

"I think if the complaint had been primarily within the subarachnoid space we would have found several thousand cells in the subarachnoid space rather than only 67, actually. There were only 67.

"*    *    *    *    *

"Q Well, my question, Doctor, is was there any cyclane in the subarachnoid space in this man?

"A I don't think there was. I think that the fact that the protein was increased out of proportion to the cells indicates that the site of the reaction was outside of the subarachnoid in the space where the caudal anesthetic is given and that the inflammation that this generated extended along blood vessels and caused this outpouring of protein.

"If one has a chemical or any other kind of a tissue reaction of this type within the subarachnoid space, primarily it is my belief that one would obtain a tremendous outpouring of white blood cells in the body, and one would have several thousand lymphocytes within the subarachnoid fluid, but we only found 67 and therefore I think the primary infection was within the extradural space, or where a caudal anesthesia is given."

This doctor also testified that in his opinion the reaction suffered by the plaintiff was due to the "idiosyncrasy" of the plaintiff's physical makeup and not to an injection of the anesthetic into the subarachnoid

cavity. No other expert testimony was offered by the plaintiff. The defendant was called as an adverse witness and his testimony confirmed that of the plaintiff's doctor.

■ Since in the medical mind the subarachnoiditis of the plaintiff could arise either from a negligent or non-negligent injection of the anesthetic, the burden cast upon the plaintiff to establish that the defendant was negligent simply is not met.

■ It would be pure speculation to say the defendant in injecting the anesthetic into the body of the plaintiff did so improperly. Judgments cannot rest on speculation or conjecture, there must be some substantial evidence for their support. *Stuhr v. Barkwill,* 215 Or 285, 332 P2d 603; *Anderson v. Sturm,* 209 Or 190, 303 P2d 509; *Lemons et al. v. Holland et al.,* 205 Or 163, 284 P2d 1041, 286 P2d 656; *Wintersteen v. Semler,* 197 Or 601, 250 P2d 420, 255 P2d 138.

The judgment of the trial court is affirmed.