AGUSTÍN RAMOS ORENGO, demandante y recurrido, *v.* GOBIERNO DE LA CAPITAL DE PUERTO RICO, demandado y recurrente.

*Número:* R-62-182     *Resuelto:* 9 de mayo de 1963

*Hartzell, Fernández & Novas* y *A. Santiago Villalonga,* abogados del recurrente; *C. H. Juliá* y *A. R. Díaz,* abogados del recurrido.

Sala integrada por el Juez Presidente Señor Negrón Fernández y los Jueces Asociados Señores Blanco Lugo y Ramírez Bages.

PER CURIAM: Los hechos de este caso son sencillos. El recurrido Agustín Ramos Orengo fue llevado en 17 de septiembre de 1959 por Carlos Juan Medina Rivera al dispensario médico del Gobierno de la Capital en el Barrio Obrero, Santurce, P.R., debido a que se había enfermado la noche antes con vómitos y diarrea. Del taxi fue trasladado a una camilla de ruedas y en ella fue llevado ante la oficinista Esther Carbonell de Reinosa quien lo refirió a la enfermera Santa Rivera por considerarlo un caso de emergencia. Esta última lo pasó al Dr. Benliza quien le dio instrucciones que lo preparara para examen mientras él terminaba con otra paciente a quien atendía. La enfermera Rivera procedió entonces a quitarle la camisa.(¹) El paciente se había mantenido tranquilo, "como si estuviera inconsciente." De súbito, levantó los pies, dio una vuelta y se cayó de la camilla, dándose un golpe en la frente. El Dr. Benliza y una enfermera graduada vinieron inmediatamente a su lado, le prestaron atención de emergencia y primera ayuda para contener la hemorragia, y como estaba con convulsiones epileptiformes el médico ordenó que le pusieran, como en efecto se le administró al recurrido una inyección de cinco gramos de luminal sódico intramuscular. Se acostó entonces al recurrido en otra camilla, se llenaron los blancos de admisión del hospital municipal para mandarlo allí y tomarle radiografías del cráneo, cogerle los puntos de sutura que necesitaba en la frente y atenderlo en todo lo que fuera necesario. Declaró el recurrido que

---

(¹) Con respecto a la responsabilidad por actuaciones de una enfermera, véase el caso de *Castro* v. *Municipio de Guánica,* 87 D.P.R. 725 (1963).

al volver a la camilla después de la caída en el dispensario, tenía una rodilla hinchada y la sangre renegrida a través del muslo; que durante los cinco días que estuvo en el hospital municipal no le trataron. Sólo le suministraron alimentos. Le dijeron que lo iban a operar al sexto día, pero en el quinto lo vio una trabajadora social que fue a la Administración de Veteranos, llamó al Hospital San Patricio y de éste vino una ambulancia, recogió al recurrido y lo llevó a dicho hospital. En el sexto día fue operado de una fractura de la patela de la pierna izquierda, la que fue enyesada. Permaneció 15 días en este último hospital; luego permaneció cuarenta días acostado en su casa; regresó a dicho hospital donde le removieron el yeso, le suministraron una muleta y le instruyeron para que fuese allí dos o tres veces en semana a tomar tratamiento de lámparas eléctricas por un período de 20 a 25 días. Usó muletas por unos cuatro meses. Declaró, además, que en el hospital municipal sintió y se quejaba de dolores en la pierna afectada, no dormía bien, pero que nada hicieron allí por él. Quedó lisiado de la referida pierna y para la fecha de la vista del caso, según declaró el recurrido, todavía le producía dolores.

Determinó el tribunal juzgador que la fractura en cuestión no hubiese ocurrido de haber ejercitado los empleados del referido dispensario el debido cuidado y diligencia para proteger al recurrido de manera que no se cayera de la camilla, lo cual constituye negligencia. Determinó, además, que con adecuado tratamiento médico y la debida atención, el recurrido no hubiese sufrido los dolores profundos y angustiosos que padeció durante los cinco días que permaneció en el hospital municipal con la rodilla amoratada y fracturada. En tal virtud, estimó dicho tribunal que la suma de $5,000 era una compensación justa y razonable por los daños personales, sufrimientos físicos y angustias mentales del recurrido y determinó en $300 la compensación que el recurrido dejó de percibir por varios meses de trabajo que no pudo rea-

lizar. En tal virtud, el tribunal de instancia condenó al Gobierno de la Capital a pagar al recurrido la suma de $5,300, más $500 de honorarios de abogado.

En su recurso de revisión que admitimos en 7 de agosto de 1962, señala el recurrente tres errores, dos de los cuales discutiremos en el curso de este dictamen.

PRIMER ERROR: "La Sala Sentenciadora incurrió en manifiesto error de derecho al formular la conclusión de que el demandado estaba en la obligación de prestarle al demandante una vigilancia continua mientras se encontraba en el dispensario del Barrio Obrero."

Citamos del alegato del recurrente lo siguiente, con nuestra aprobación:

"Al discutir sus conclusiones de derecho, el Tribunal inferior se expresó como sigue:

'Entendemos, que la patela de la rodilla izquierda del demandante no se hubiese fracturado de haber ejercitado los empleados del Dispensario Médico del Bo. Obrero el debido cuidado y diligencia para proteger a dicho paciente. Al ingresar un paciente en una clínica, a ésta corresponde determinar su estado y proporcionarle la debida atención para protegerlo conmensurado a su estado. *La falta de diligencia para determinar el grado de cuidado y vigilancia continua para que no se cayera de la camilla, era la obligación de los funcionarios y empleados de dicho Dispensario Médico. La falta de ese cuidado ordinario, constituye negligencia . . .'* Véase *Relación del Caso, Determinaciones de Hecho y Conclusiones de Derecho*, pág. 6. (Subrayado nuestro.)

"Esta conclusión del Tribunal inferior presupone que las enfermeras que atendieron al demandante en el dispensario del Barrio Obrero debieron anticipar la posibilidad de la ocurrencia del accidente. El razonamiento del Tribunal parece estar predicado en la doctrina del caso de *Hernández* v. *La Capital*, 81 D.P.R. 1031, donde se estableció como norma de conducta para los hospitales en relación con sus pacientes, que aquéllos deben ofrecer a éstos el cuidado y la atención razonable que las circunstancias exijan; y que dichas normas de cuidado y atención han

de ser medidas tomando como índice las prácticas prevalecientes en la comunidad y resultando entre ellas decisivas en cada caso las condiciones específicas del paciente."

Sin embargo, el magistrado juzgador no se apoyó en el caso de *Hernández*, supra, sino en los de *Roses* v. *Juliá*, 67 D.P.R. 518 (1947); *Carrasquillo* v. *Am. Missionary Assn.*, 61 D.P.R. 867 (1943); y *President & Director of Georgetown College* v. *Hughes*, 130 F.2d 810 (C.A. D.C. 1942.)

En *Carrasquillo*, supra, resolvimos que las quemaduras sufridas por un recien nacido al colocársele sobre dos bolsas de agua caliente que una enfermera había puesto en la cuna, no era un accidente inevitable, pues mediante el ejercicio de un cuidado razonable por la enfermera y el médico que atendía a la parturienta y al niño comprobando si la cuna estaba a la temperatura requerida, hubiese seguramente evitado el accidente. En este caso, citando al de *President and Director of Georgetown College*, supra, también resolvimos que un hospital es responsable por los daños sufridos por el niño debido a la negligencia de sus empleados, no obstante el hecho que dicho hospital preste servicios gratuitos a pacientes insolventes. En *Roses*, supra, una paciente que sufría de psicosis involucional, con tendencia especial al suicidio, fue recluida en la clínica del demandado. Escapó de su habitación, subió al techo del edificio y de allí se cayó al piso, sufriendo golpes y lesiones de las cuales murió el mismo día de la caída. Sostuvimos la conclusión del tribunal de instancia en este caso en el sentido de que la muerte de la paciente no hubiera ocurrido si los empleados del demandado hubiesen ejercido el debido cuidado y diligencia para proteger a la paciente. En este caso el demandado había sido informado por el médico esposo de la paciente que "los fenómenos nerviosos que había observado en ella le daban a entender que se trataba de una suicida potencial." En *Hernández*, supra, reafirmamos la doctrina que establecimos en *Serra* v. *Autoridad del Transporte*, 67 D.P.R. 611 (1947), al efecto de que el Gobierno de

la Capital responde de los actos negligentes de sus empleados y funcionarios realizados en el desempeño de sus deberes y que esa responsabilidad no sufre alteración alguna cuando los actos negligentes se cometen al prestarse un servicio, que como en el presente caso, se ofrece gratuitamente. [2] Resolvimos, además, que un hospital público o privado no es un asegurador de sus pacientes contra todo daño que éstos puedan infligirse o que les causen otras personas; que el hospital tiene el deber de ofrecer al paciente el cuidado y la atención que las circunstancias exigen, y éstos se miden por normas de razonabilidad y prudencia; que en ocasiones puede exigirse al hospital la adopción de medidas precautorias adicionales a las ordinarias que pueden llegar hasta la vigilancia continua e ininterrumpida del paciente como en el caso de enfermos con diversas manifestaciones de desórdenes o deficiencias mentales, delirantes, epilépticos o aquéllos que se encuentran en un estado de inconsciencia total o parcial causado por el uso de drogas o anestésicos y que, asimismo, las normas de mayor exigencia rigen la conducta del hospital cuando se trata de niños enfermos debiendo ir en aumento el cuidado y la atención según se reduce la edad del niño y deben acen-

---

[2] La nueva Ley Municipal, que es la Ley Núm. 142 de 21 de julio de 1960 (21 L.P.R.A. secs. 1601 a 1603) da jurisdicción al Tribunal Superior, a instancia de parte para conceder, mediante juicio ordinario, compensación por daños y perjuicios a los perjudicados por actos u omisiones de los funcionarios o empleados de los municipios causados por malicia, negligencia o ignorancia inexcusable. Pero *el que tuviere reclamación de cualquier clase contra una corporación municipal*, por daños personales o a la propiedad, causados por culpa o negligencia de dicha corporación, *deberá presentar al jefe ejecutivo de ésta una notificación escrita,* haciendo constar en forma clara y concisa la fecha, sitio, causa y naturaleza general del daño sufrido, la cuantía de la compensación monetaria o el tipo de remedio adecuado al daño sufrido, los nombres y direcciones de sus testigos y la dirección del reclamante así como el sitio donde recibió tratamiento médico. *Dicha notificación que podrá hacerse personalmente o por correo certificado se presentará dentro de los 90 días siguientes a la fecha en que el reclamante tuvo conocimiento de los daños que reclama y no podrá iniciarse acción judicial de clase alguna contra una corporación municipal por daños causados por su culpa o negligencia si no se hubiese hecho tal notificación dentro del plazo prescrito.* (Énfasis nuestro.)

tuarse si, a la incapacidad de los años, se unen reacciones anormales causadas por la enfermedad. Específicamente en este caso concluimos que la muerte de una niña de tres años que padecía de meningitis al quedarse colgada del cordón de su camisa cuando éste se enganchó en un tornillo cuando aparentemente la niña había tratado de bajarse de su cuna en el hospital municipal del Gobierno de la Capital, se debió a la negligencia de los empleados de dicho hospital. Dijimos entonces que: "Se trata en este caso de una niña de tres años, que aunque mejorada, estaba todavía enferma de meningitis, en estado febril y de gran inquietud, y, por todas estas razones, completamente imposibilitada de cuidar de sí misma. El Hospital tenía conocimiento completo de su enfermedad y de su estado, y a la enfermera que la atendía al momento de ocurrir su muerte le constaba que la niña en por lo menos una ocasión había abandonado su cuna y se había subido encima de un biombo en una situación de grave peligro. Igualmente era de conocimiento de esa enfermera que la niña había estado muy inquieta unos minutos antes del accidente, a tal extremo que ella consideró propio amarrarla de pies y manos a las barandas de la cuna. Sabía, además, que al desamarrarla la niña no se había dormido sino que estaba 'aparentemente tranquila' y que de acuerdo con su experiencia los niños al ser desamarrados simulan ese estado de quietud 'porque cogen miedo para que no los amarren otra vez.'

". . . La enfermera se hallaba fuera de esa sala, atareada cambiándole el suero a uno de los pacientes graves, en una posición de la cual podía observar la sala contigua a través de un cristal, pero no directamente a Marta Iris. Como cuestión de hecho, no miró hacia Marta Iris mientras realizaba la antedicha labor.

"Creemos que el Hospital pudo haber ofrecido a Marta Iris la protección y el cuidado que su condición requería mediante el uso de ciertas medidas sencillas y de costo mínimo. Así por ejemplo, pudo asignar una enfermera adicional en

los momentos en que la auxiliar estaba fuera del pabellón o cuando había varios pacientes que requerían vigilancia especial; agrupar a estos últimos de manera que al asistir a uno de ellos, la enfermera pudiera, a la vez, vigilar de cerca a los demás; y proveer cunas equipadas de tal manera que los niños inquietos no pudiesen abandonarlas."

Los hechos en el caso ante nos son completamente distintos a los que consideramos en los casos que acabamos de analizar. Ni actos específicos que causaron las lesiones en *Carrasquillo*, supra, ni el conocimiento de la condición mental del enfermo que tuvieron los empleados del demandado en *Roses*, supra, ni las condiciones especialísimas que existían en *Hernández*, supra, están presentes en el que nos ocupa. Por el contrario, la prueba más bien es al efecto de que el recurrido llegó al dispensario médico tranquilo, extenuado al extremo que hubo de entrarlo en camilla de ruedas y que en el preciso momento en que una enfermera le quitaba la camisa con el fin de prepararlo para examen médico, súbita e inesperadamente se viró y se cayó de la camilla. En ningún momento fue el recurrido abandonado en la camilla; al contrario, se cayó de ella mientras se le atendía. El magistrado juzgador concluyó que la inyección se le puso después de la caída de manera que ésta no fue causada por aquélla. Como dijimos en *Hernández*, supra:

"El deber de previsión no se extiende a todo peligro imaginable que concebiblemente pueda amenazar la seguridad del paciente sino a aquél que es probable que suceda y que llevaría a una persona prudente a anticiparlo."

Como indica la representación legal de la recurrente en su hábil y bien razonado alegato, (3) "al ocurrir el accidente habían solamente transcurrido minutos desde la llegada del demandante al dispensario. Aun si su condición física hubiera

---

(3) Por esta razón citamos extensamente del mismo. Lamentablemente, no es con frecuencia que se nos ilustra tan cabalmente como se hace en este caso.

sido de tal naturaleza que hubiera podido dar lugar al accidente, lo cual no se demostró, los empleados del dispensario no tuvieron tiempo suficiente para descubrir tal condición y poder prever tales posibles consecuencias. Si aceptáramos, solamente a los efectos de la argumentación, que el accidente ocurrió en la forma descrita por el demandante, o sea, que lo acostaron en la camilla y se quedó dormido y al virarse se cayó al suelo, tendríamos necesariamente que concluir que esa norma de conducta no caía dentro de aquellos deberes de vigilancia, protección y cuidado necesarios que debían brindarle los empleados del dispensario. El velar a un paciente adulto dormido, que descansa tranquilamente, no cae dentro del ámbito de aquellos deberes 'administrativos' o 'ministeriales' que pueden calificarse como de índole rutinaria y que se refieren al cuidado, protección y de hospitalización corriente del enfermo, que contempla la doctrina expuesta en el caso de *Hernández*, supra.

"Y no podemos dejar de insistir en que toda la evidencia de este caso demuestra que el accidente ocurrió de una manera tan súbita que su ocurrencia no se pudo prever."

En *Roth* v. *Havens, Inc.*, 353 P.2d 159 (Wash. 1960), una enferma mental se cayó de su cama y se lesionó mientras la enfermera salió momentáneamente de su habitación en el hospital demandado sin antes haber subido las barandas de la cama. De acuerdo con la prueba, mientras la enfermera atendía a la enferma esa mañana, y hasta ese momento, ésta parecía normal y coherente. Era requisito subir las barandas de la cama después de cada tratamiento de choque eléctrico cuando la paciente estaría temporeramente confundida, incoherente e inestable. Bajo tales circunstancias el Tribunal Supremo del Estado de Washington citó del caso de *Cockran* v. *Harrison Memorial Hospital*, 254 P.2d 752 (Wash. 1953), lo siguiente:

"Los hospitales le deben a sus pacientes aquel cuido y atención que su condición mental y física razonablemente requiere, y aun-

que la ley exige el cuidado que una persona razonable tomaría dentro de las circunstancias existentes, no se requiere tomar medidas contra un peligro que las circunstancias conocidas no sugieren que pueda ocurrir. . . ."

Continuó diciendo dicho tribunal:

"Arguye el recurrido que el hecho que la enfermera dejó al paciente momentáneamente solo en cama con las barandas bajas constituyó una violación del deber de ejercer debido cuidado. Esto de por sí no es prueba de negligencia. Debe haber prueba de que el paciente estaba en tales condiciones, conocidas por la enfermera o que ésta debió haber conocido que a los efectos de un cuidado razonable bajo las circunstancias se requiriese que las barandas se hubiesen subido. No hubo tal prueba.

". . . Por consiguiente, otras condiciones que alegadamente ocasionaron el que la enfermera dejase al paciente momentáneamente con las barandas bajadas no constituyen negligencia de parte del hospital."

En el caso de *McPortland* v. *State*, 98 N.Y.S.2d 665 (1950), un paciente epiléptico recluido en un hospital estatal, en estado de convalecencia y cuando hacía varias semanas que no sufría un ataque, se ahogó en una pileta de abrevadero de ganado situada al otro lado de una cerca de tres pelos de alambre que la separaba del pabellón donde vivía el enfermo. Hubo prueba de que tuvo un ataque epiléptico que lo hizo caer sobre la cerca con la parte alta del cuerpo dentro de la pileta. Al confirmar la sentencia declarando la reclamación sin lugar, dijo la corte:

"Decir que es de esperarse que un paciente epiléptico se caiga en intervalos prolongados no es decir que lo que ocurrió aquí debió anticiparse so pena de responsabilidad. Nuestro juicio nos indica que una gerencia de hospital razonablemente prudente no hubiera anticipado lo que ocurrió y no debe esperarse que anticipe lo que ocurrió a riesgo de incurrir en responsabilidad por ello."

Volvemos a citar del alegato del recurrente:

"De que el accidente ocurrió súbita e inesperadamente lo demuestran claramente las siguientes manifestaciones de la tes-

tigo del demandado, Sra. Santa Rivera. Páginas 48 y 50 de la transcripción de evidencia.

*"Página 48*

'P ¿Podría informar al Tribunal en qué consistió su intervención con este señor?

'R Bueno, el señor me lo pasaron en una camilla. Estaba preparándolo cuando de momento el señor le dio algo, se volteó y se cayó al piso.'

*"Página 50*

'P ¿Cómo fue que ocurrió la caída, si usted sabe?

'R Yo no sé, de momento el señor, verdad, alzó los pies para arriba, dio una vuelta y cayó enseguida. Como la camilla es estrecha y cayó al piso.

'P ¿Eso fue súbito o gradualmente?

'R De momento.'

"Lo súbito e inesperado del accidente quedó también confirmado por el testimonio del Dr. Benliza:

*"Página 68*

'P ¿Podría decirnos en qué consistió la intervención?

'R Bueno, . . . y cuando yo llegué todavía estando en el suelo estaba con convulsiones crónicas . . . . . .'

*"Página 69*

'P ¿Cuál fue el objeto de esa inyección?

'R Como estaba con convulsiones había que calmárselas.

'P ¿Qúe tipo de convulsiones y ataques?

'R Tipo de [sic]

'P ¿Eso surge de momento o gradualmente?

'R Tiene comienzos bruscos.'

*"Página 70*

'P ¿Doctor, estos síntomas de convulsiones que usted notó en este demandante son típicos de epilepsia?

'R No, he dicho que son epileptiformes, que tienen la forma de un ataque epiléptico.'

"Tenemos pues, que mientras la enfermera, Sra. Santa Rivera, lo estaba preparando, al demandante le sobrevino un súbito ataque de tipo epileptiforme a consecuencia del cual comenzó a moverse bruscamente; y también tenemos que este tipo de comportamiento tampoco era uno que podía ser previsto por la en-

fermera que lo atendía en esos momentos, ya que, como hemos visto, el ataque se produjo en forma inesperada no habiendo dado anteriormente muestras de que el mismo pudiera ocurrir.

"Ante hechos tan claros, la Sala Sentenciadora no tenía base alguna para concluir que los empleados del demandado tenían la obligación de establecer una vigilancia continua sobre la persona del demandante. Nada en la prueba demuestra que dichos empleados tuvieran la más leve sospecha de que al demandante le habría de sobrevenir el referido ataque."

SEGUNDO ERROR: "La Sala Sentenciadora erró al concluir, como cuestión de derecho, que los médicos que atendieron al demandante en el Hospital Municipal no le suministraron un tratamiento adecuado."

Arguye el recurrente, con razón, a nuestro juicio, que:

"En el curso de la discusión de sus conclusiones de derecho, el Tribunal inferior se expresó como sigue:

'. . . Pero hay algo más, el paciente estuvo cinco (5) días en el Hospital Municipal con la rodilla amoratada y fracturada sin que se le hiciera cura de clase alguna, cuando con adecuado tratamiento médico y la debida diligencia, el paciente no hubiese sufrido los dolores profundos y angustiosos que padeció.' Pág. 6. *Relación del Caso, Determinaciones de Hecho y Conclusiones de Derecho*.

"Lo único que existe en el récord para que el Tribunal inferior pudiera quizás basar la conclusión anterior, son unos indicios en la evidencia a todas luces insuficiente. Tales indicios aparecen en el testimonio del propio demandante, quien declaró que mientras estuvo recluido en el Hospital Municipal el único tratamiento a que fuera sometido fue el de guardar cama, descansar y recibir alimentos y que al sexto día era que lo iban a operar, pero que entonces se trasladó al Hospital San Patricio.

"No hubo evidencia alguna de que tal tipo de tratamiento no fuera el apropiado para este caso en particular y que no fuera el que estuviera en uso por los demás médicos de la comunidad para esa clase de casos. Al considerar la declaración del demandante, el Tribunal *a quo* se convirtió en su propio perito para juzgar y determinar lo que era una forma adecuada de tratar la lesión en la rodilla del demandante y para concluir que la

forma en que fue tratada por los médicos que lo atendieron no era la indicada para el caso."

El tribunal de instancia erró al hacer tal determinación. *Carbone* v. *Warburton*, 91 A.2d 518 (N.J. 1952), confirmado en 94 A.2d 680 (1953); *Crovella* v. *Cochrane*, 102 So.2d 307 (Fla. 1958).

Como informa el recurrente, "Es doctrina bien arraigada en nuestro derecho que en ausencia de prueba en contrario asiste a los profesionales la presunción de que en el desempeño de sus funciones han ejercido un grado de cuidado razonable y de que el tratamiento dado al paciente fue el adecuado. *Rivera* v. *Dunscombe*, 73 D.P.R. 819 (1952); *Sáez* v. *Municipio de Ponce*, Sentencia del 26 de febrero de 1962. Correspondía pues al demandante controvertir esta presunción y para conseguirlo, la prueba debió demostrar que existía algo más que una mera posibilidad de que el daño se debiera al incumplimiento por el médico de su obligación."

En *Sáez*, supra, dijimos:

"Según expresamos anteriormente, una acción para exigir responsabilidad profesional *no es distinta de un caso ordinario de daños y perjuicios por negligencia*. Todo cuanto se requiere es que la parte demandante establezca por la preponderancia de la evidencia—creída por el juzgador—que el daño emergente fue causado por los actos de negligencia, falta de cuidado o impericia del médico. Existe la presunción, *en ausencia de evidencia en contrario,* que se ha ejercitado un grado de cuidado razonable y de que se administró el tratamiento adecuado al paciente. Corresponde al demandante presentar evidencia suficiente para controvertir esta presunción y para ello la prueba debe demostrar que existe algo más que una mera *posibilidad* de que el daño se debiera al incumplimiento por el médico de su obligación. Se requiere que la relación de causalidad no se establezca a base de una mera especulación o conjetura, *Johnson* v. *Ely*, 205 S.W.2d 759 (Tenn. 1947); *Lanier* v. *Trammell*, 180 S.W.2d 818, 824 (Ark. 1944); sino por la preponderancia de la evidencia, *Demchuk* v. *Bralow*, 170 A.2d 868 (Pa. 1961); *Atkins* v. *Humes,*

107 So.2d 253 (Fla. 1958) ; *Soest* v. *Balsinger,* 141 P.2d 13 (Cal. 1943) ; *Sansom* v. *Roos-Loos Medical Group,* 134 P.2d 927 (Cal. 1943) ; *Lohr* v. *Watson,* 2 N.W.2d 6, 8 (S.D. 1942) ; o sea, que el daño se ha debido con mayores probabilidades a la negligencia que el demandante imputa. *Crewse* v. *Munroe,* 355 P.2d 637 (Ore. 1960) ; *Thompson* v. *Lillehei,* 164 F.Supp. 716 (Minn. 1958) ; cf. *Steele* v. *Woods,* 327 S.W.2d 187 (Mo. 1959). No puede exigírsele a este respecto que elimine toda otra posible causa del daño. *Christie* v. *Callahan,* 124 F.2d 825, 840 (C.C.A.-D.C. 1941) ; *Barham* v. *Widing,* 291 Pac. 173, 177 (Cal. 1930) ; *Boles* v. *Hotel Maytag Co.,* 253 N.W. 515, 517 (Iowa 1934). Si la evidencia señala más de una causa probable del daño, no puede imponérsele responsabilidad al médico a menos que del conjunto de la prueba surja que la actuación negligente atribuida a éste es la que con mayores probabilidades lo causó. *Ritter* v. *Sivils,* 293 P.2d 211 (Ore. 1956) ; *Heinlich* v. *Harvey,* 39 N.W.2d 394 (Wis. 1949) ; *Woronka* v. *Sewall,* 69 N.E.2d 581 (Mass. 1946) ; *Anderson* v. *Nixon,* 139 P.2d 216, 220 (Utah 1943). Véase Anotación *Proximate cause in malpractice cases,* 13 A.L.R.2d 11 (1950)."

■ Estamos conscientes de la lamentable renuencia que generalmente prevalece entre los miembros de la clase médica a prestar testimonio en casos como éste. No obstante, la prueba no demuestra que el recurrido siquiera intentara obtener y presentar prueba alguna demostrativa de que la espera de cinco días en el hospital y la indicación de que en el sexto sería operado, como en efecto lo fue en otro hospital, constituía una falta de cuidado, un caso de mala práctica por negligencia de los médicos del hospital. (⁴)

■ Convenimos con el recurrente que: ". . . el hecho de que la operación de la rodilla del demandante no se fijara

---

(⁴) Cf. *Robinson* v. *Wirts,* 127 A.2d 706 (Pa. 1956) ; *Modrzynski* v. *Lust,* 88 N.E.2d 76 (Ohio 1949) ; 82 A.L.R.2d 1257; 57 A.L.R.2d 379; 141 A.L.R. 5, suplementado en 81 A.L.R.2d 597; Louisell and Williams, *Trial of Medical Malpractice Cases* (1960), párrafo 14.06, pág. 436; R. B. H. Gradwohl, *Legal Medicine* (1954), pág. 114; Harper and James, *The Law of Torts,* párrafo 17.1, pág. 968.

Las cortes han prescindido del requisito de presentar testimonio pericial tan sólo en aquellos casos en que el sentido común del hombre lego dice que el daño no se produciría de no haber mediado negligencia por

para llevarse a cabo antes del sexto día después de ocurrido el accidente, fue lo que movió a la corte a concluir que el tratamiento recibido no era el indicado. Pero el solo hecho de que el demandante durante ese período de tiempo estuviera sujeto a molestias y a dolores no da lugar a una inferencia de negligencia. Tal actuación por parte del tribunal inferior tiene el efecto de suprimir, con la sola declaración del demandante sobre el hecho de que lo tuvieron acostado durante cinco días y el sexto lo iban a operar, la presunción de que los médicos que lo trataron usaron su mejor criterio al elegir el tipo de tratamiento y la forma en que lo iban a aplicar. ¿Cómo sabemos que se podía operar antes del sexto día? ¿En qué condiciones estaba la pierna y la salud general del demandante

---

parte de alguien y donde no entra en juego el uso del buen juicio del médico al hacer una decisión sobre la forma y manera de tratar al paciente.

Los siguientes son ejemplos de los casos en que los tribunales han prescindido de la necesidad de presentar testimonio pericial:

Cuando la cuestión envuelta era sobre:

(1) objeto dejado dentro del cuerpo *Hohenthal* v. *Smith*, 114 F.2d 494 (CA DC 1940) (aguja dejada en el abdomen); *Ales* v. *Ryan*, 64 P.2d 409 (Cal. 1937); *Armstrong* v. *Wallace*, 47 P.2d 740 (Cal. 1935) (esponja dejada en el abdomen); *Funk* v. *Bonham*, 183 N.E. 312 (Ind. 1932) (esponja dejada en el abdomen).

(2) un daño causado a una parte del cuerpo que se encontraba dentro del área tratada, pero que estaba sana; también sobre daños causados a partes del cuerpo que estaban distantes del área donde se estaba aplicando el tratamiento en cuestión; *James* v. *Spear*, 338 P.2d 22 (Cal. 1959); *Thomsen* v. *Burgeson*, 79 P.2d 136 (Cal. 1938) (remoción de la úvula durante tonsilectomía); *Brown* v. *Shortlidge*, 277 P.132 (Cal. 1929) (rotura de diente durante tonsilectomía).

(3) remoción de una parte no afectada del cuerpo en lugar de la que realmente se trataba de remover; *Thomsen* v. *Burgeson*, supra; *Griffin* v. *Norman*, 192 N.Y.S. 322 (1922).

(4) dientes dejados caer por la tráquea del paciente; *Meyer* v. *St. Paul-Mercury Indemnity Co.*, 61 So.2d 901, confirmado en 73 So.2d 781 (La. 1953); *Whetstine* v. *Moravec*, 291 N.W. 424 (Iowa 1940); *Nelson* v. *Painless Parker*, 104 Cal. App. 770 (1930).

(5) quemaduras de (a) bolsas de agua caliente, (b) máquinas de diatermia, (c) lámparas de calor, (d) Rayos-X, particularmente

durante ese período de tiempo? Solamente mediante el testimonio médico al efecto hubiera podido el tribunal de instancia estar en condiciones de concluir que al demandante no se le suministró el tratamiento adecuado."

Por las razones indicadas concluimos que se cometió el segundo error señalado.

En vista de las conclusiones precedentes creemos innecesario discutir el tercer error señalado que es al efecto de que el tribunal juzgador concedió entero crédito a la evidencia presentada por el recurrido e hizo caso omiso de la prueba de la recurrente.

*Por las razones indicadas debe revocarse la sentencia y dictarse otra declarando sin lugar la demanda en este caso.*

cuando son usados para propósitos de diagnóstico, (e) vaporizadores, (f) agentes químicos, (g) lámparas (*bedside*); *Bessinger* v. *De Loach*, 94 S.E.2d 3 (S.C. 1956); *Emrie* v. *Tice*, 258 P.2d 332 (Kan. 1953); *Dodson* v. *Pohle*, 239 P.2d 591 (Ariz. 1952); *Blackman* v. *Zeligs*, 103 N.E.2d 13 (Ohio 1951); *West Coast Hospital Ass'n* v. *Webb*, 52 So.2d 803 (Fla. 1951); *Crowe* v. *McBride*, 153 P.2d 727 (Cal. 1944); *Trindel* v. *Wheeler*, 143 P.2d 932 (Cal. 1943); *Dillon* v. *Rockaway Beach Hospital*, 30 N.E.2d 373 (N.Y. 1940); *McCullough* v. *Langer*, 73 P.2d 649 (Cal. 1937); *Timbrell* v. *Suburban Hospital*, 47 P.2d 737 (Cal. 1935); *Vonault* v. *O'Rourke*, 33 P.2d 535 (Mont. 1934); *Quillen* v. *Skaggs*, 25 S.W.2d 33 (Ky. 1930); *Moore* v. *Steen*, 283 Pac. 833 (Cal. 1929); *Meyer* v. *McNutt Hospital*, 159 Pac. 436 (Cal. 1916).

(6) infección como resultado de instrumentos usados sin esterilizar; *Mastro* v. *Kennedy*, 134 P.2d 865 (Cal. 1943); *Barham* v. *Widing*, 291 Pac. 173 (Cal. 1930).

(7) omitir el uso de radiografías para diagnosticar posibles fracturas; *Reynolds* v. *Struble*, 18 P.2d 690 (Cal. 1933).

(8) una fractura tan inadecuadamente atendida o curada que cualquier persona puede notarla; *Olson* v. *Weitz*, 221 P.2d 537 (Wash. 1950).

(9) incapacidad como resultado de drogas administradas al cuerpo; *Wolfsmith* v. *Marsh*, 337 P.2d 70 (Cal. 1959); *Toy* v. *Rickert*, 146 A.2d 510 (N.J. 1958); *Bauer* v. *Otis*, 284 P.2d 133 (Cal. 1955).

(10) explosión de gases anestésicos; *Dierman* v. *Providence Hospital*, 188 P.2d 12 (Cal. 1948).

Véase, sin embargo, el caso de *Sáez* v. *Municipio de Ponce*, supra.

El Juez Presidente Señor Negrón Fernández concurre con el resultado.