RAFAEL COLÓN PRIETO, NILDA GONZÁLEZ CASAÑAS y la SOCIEDAD LEGAL DE BIENES GANANCIALES compuesta entre ambos, MARÍA DOLORES COLÓN GONZÁLEZ y RAFAEL COLÓN GONZÁLEZ, representados por su padre con patria potestad RAFAEL COLÓN PRIETO, demandantes y recurridos, *v.* WILFREDO A. GÉIGEL, demandado y recurrente.

*Número:* RE-89-96          *Resuelto:* 11 de junio de 1998

*Benito I. Rodríguez Massó*, abogado del recurrente; *Samuel Torres Cortés*, abogado de los recurridos.

## SENTENCIA

Los demandantes recurridos presentaron una causa de acción para exigir un resarcimiento al abogado demandado

por los daños que les causó su impericia profesional al provocar la desestimación y el archivo del caso en el que reclamaban daños por impericia médica. *Colón Prieto v. Ark*, Caso Núm. CS-73-3814, Tribunal Superior, Sala de Mayagüez. Alegan que el licenciado Géigel, negligentemente, violó el deber de información y el deber de salvaguardar su derecho a apelar, y que a causa de esta negligencia se vio malograda su reclamación de impericia médica contra el Dr. Phillip R. Ark. El antiguo Tribunal Superior, Sala de San Juan (Hon. Wilfredo Alicea López, Juez), declaró con lugar la demanda y condenó al demandado a indemnizar a los demandantes con sesenta mil dólares ($60,000) por daños con intereses al 11.5 por ciento desde la presentación de la demanda, las costas del procedimiento, más ocho mil dólares ($8,000) en concepto de honorarios de abogado. De dicha sentencia recurrió ante nos el demandado, Lcdo. Wilfredo A. Géigel, para solicitarnos que la revoquemos por no existir prueba suficiente para sustentarla. Por entender que el recurrente tiene razón, revocamos.

Los hechos pertinentes a este caso son los siguientes. El 10 de noviembre de 1971 Rafael Colón Prieto fue sometido a una intervención por parte del cirujano dental, Dr. Phillip R. Ark, para extraerle los cuatro (4) cordales, los cuales estaban impactados. Al despertarse de esta intervención, el señor Colón Prieto percibió que estaba sangrando y que tenía una herida en la lengua que le producía una sensación de ardor, como si fuese una quemadura intensa, y de insensibilidad. Esa noche el doctor Ark lo examinó y le indicó que la herida era resultado de una mordida autoinfligida mientras se encontraba bajo los efectos de la anestesia y que los síntomas eran consecuencias normales de la intervención, y que desaparecerían con el tiempo. No obstante, el tiempo pasó pero el dolor agudo continuó, a consecuencia de lo cual se vieron afectadas las actividades ordinarias del señor Colón Prieto y de sus familiares.

Tras varias visitas a la oficina del doctor Ark para darle seguimiento a los síntomas que había desarrollado, en marzo de 1972 el doctor Ark le informó al señor Colón Prieto que de persistir los síntomas sería necesario cortarle un pedazo de la lengua. Inconforme con este diagnóstico, el señor Colón Prieto decidió acudir a otro cirujano dental, quien a su vez lo refirió al neurocirujano Max Ramírez de Arellano. Luego de realizar los estudios pertinentes, el 10 de noviembre de 1972 este último concluyó que la lesión sufrida por el señor Colón Prieto no fue causada por una mordida autoinfligida, sino por una cortadura o cercenamiento del nervio lingual derecho. Como resultado, el 10 de septiembre de 1973 el señor Colón Prieto, su esposa y sus hijos presentaron una demanda por impericia médica contra el doctor Ark.

Estando pendiente este caso ante el antiguo Tribunal Superior, Sala de Mayagüez, la representación legal del señor Colón Prieto renunció y fue sustituida por el licenciado Géigel, aquí demandado. Los trámites en el caso continuaron y se señaló la vista en su fondo para el 18 de abril de 1978. Posteriormente, esta vista fue pospuesta por acuerdo de las partes y con el visto bueno del Juez Superior Juan E. Lugo Rodríguez, con el propósito de dilucidar la defensa de prescripción que había sido presentada por la parte demandada. Sin embargo, llegado el día de la vista que había sido pospuesta y ante la incomparecencia de las partes, otro juez, quien estaba ajeno al acuerdo de posposición, dispuso el archivo de la demanda e impuso a los abogados una sanción económica en beneficio del Estado. Como resultado, el licenciado Géigel presentó un total de siete (7) mociones en las cuales objetó la sanción impuesta y solicitó que se dejara sin efecto la sentencia dictada, pero en ninguna tuvo éxito. Tampoco solicitó la revisión de estas resoluciones ante este tribunal apelativo ni le informó a su cliente, el señor Colón Prieto, que su causa de acción había sido desestimada.

Al advenir en conocimiento de que su demanda había sido archivada y de que el período para solicitar una revisión de la sentencia de archivo ya había transcurrido, el señor Colón Prieto, su esposa y sus hijos presentaron una demanda por mala práctica legal contra el licenciado Géigel ante el antiguo Tribunal Superior, Sala de San Juan, en la que alegaron que a causa de la negligencia de éste habían perdido su causa de acción contra el doctor Ark. Previo ciertos trámites de rigor, la Sala de San Juan desestimó sumariamente la demanda al resolver que la reclamación contra el doctor Ark estaba prescrita y que, por lo tanto, la reclamación contra el licenciado Géigel no tenía posibilidades de prevalecer. Además, resolvió que el licenciado Géigel había sido diligente en la tramitación del pleito, ya que solicitó —mediante múltiples mociones— que se dejara sin efecto la sentencia. De dicha determinación del tribunal de instancia acudió ante nos el demandante para presentar una solicitud de *certiorari*.

El 29 de marzo de 1984 revocamos la sentencia dictada por el tribunal de instancia y resolvimos que la reclamación contra el doctor Ark no estaba prescrita. Además, aclaramos la diferencia entre la facultad que tiene un abogado para decidir si apela las determinaciones de un tribunal y su obligación de salvaguardar el derecho de apelar de su cliente, y emitimos una orden para continuar los procedimientos ante el Tribunal Superior para que se determinara si el abogado demandado incurrió en mala práctica profesional. También establecimos que al igual que en todo caso por daños y perjuicios contra un profesional, para que proceda una causa de acción por mala práctica de un abogado de acuerdo con el Art. 1802 del Código Civil, 31 L.P.R.A. sec. 5141, es necesario que se configuren los elementos básicos siguientes:

1) la existencia de una relación de abogado-cliente que genere un deber;

2) que el abogado, por acción u omisión, viole ese deber;

3) que esa violación sea la causa próxima del daño al cliente, y

4) que el cliente, como reclamante, sufra un daño o pérdida. *Colón Prieto v. Géigel*, 115 D.P.R. 232 (1984).

Una vez abiertas de nuevo las vías forenses, el tribunal de instancia procedió a fraccionar el pleito, juzgando primeramente el aspecto sobre la responsabilidad del licenciado Géigel. En esta primera etapa, el tribunal dictó una sentencia, en la cual determinó que entre los demandantes y el demandado existía una relación de abogado-cliente, mediante la cual los demandantes le encomendaron al demandado la representación legal de sus derechos en la reclamación por impericia médica contra el doctor Ark. Esta relación generó para el licenciado Géigel la obligación de cumplir con los deberes que le impone el Código de Ética Profesional, en particular aquellos deberes del abogado para con su cliente. La sentencia también estableció que el letrado faltó a varios de estos deberes. Primero, violó el deber de mantener informado a su cliente, Canon 19 del Código de Ética Profesional, 4 L.P.R.A. Ap. IX, porque no le informó al demandante que se había archivado su demanda contra el doctor Ark. Segundo, violó el principio de diligencia del Canon 18 del Código de Ética Profesional, 4 L.P.R.A. Ap. IX, porque no informó ni instruyó a su cliente sobre los derechos de apelación que podría tener con respecto a dicha sentencia de archivo, ni recurrió por su propia cuenta ante este Tribunal. Finalmente, resolvió que el licenciado Géigel estaría obligado a indemnizar a los demandantes, si en la segunda etapa del pleito se demostraba que tal conducta culposa les había causado daños.[1]

En la segunda etapa del pleito, el tribunal de instancia concluyó que a no ser por la mala práctica legal del licenciado Géigel, la reclamación de los demandantes contra el doctor Ark hubiera prosperado. Determinó que el doctor

---

[1] Esta sentencia advino final y firme sin que sus determinaciones fueran cuestionadas por ninguna de las partes.

Ark operó al señor Colón Prieto sin haber obtenido su consentimiento informado; que fue negligente al no recomendarle a tiempo que visitara a un neurocirujano, y que por su negligencia durante la extracción de los cordales le cercenó el nervio lingual derecho. Como resultado de ello, condenó al licenciado Géigel a compensarle a los demandantes por los daños que le causó el doctor Ark con su impericia médica. Es de esta sentencia que recurre ante nos el licenciado Géigel para solicitarnos que dejemos sin efecto las determinaciones del tribunal de instancia.

## I

El recurrente sostiene que erró el tribunal de instancia al concluir que no obtuvo el consentimiento informado del señor Colón Prieto. En primer lugar, señala que el tribunal no debió admitir la evidencia sobre la falta de un consentimiento informado y que dicha admisión errónea fue un factor decisivo en la determinación a la que llegó el tribunal. Arguye que ni en la demanda original presentada contra el doctor Ark ni en momento alguno antes del día del juicio en el caso por mala práctica legal, se solicitó enmienda alguna a las alegaciones para incluir una reclamación por la falta de consentimiento informado. Asimismo, alega que al momento de presentarse dicha evidencia (el día del juicio), ésta fue objetada rigurosamente por el fundamento de que era ajena a las alegaciones hechas por las partes. Finalmente sostiene que, al admitir dicha evidencia, el tribunal le causó un perjuicio sustancial porque añadió una controversia al pleito. Siendo ello así, expone que no podía el tribunal de instancia admitirla ni ordenar que se compensaran los daños causados alegadamente por la falta de consentimiento informado.

Luego de revisar el expediente en el caso *Colón Prieto v. Ark*, Caso Civil Núm. CS-73-3814, y de examinar las transcripciones de evidencia del caso *Colón Prieto v. Géigel*,

Caso Civil Núm. 79-2460, concluimos que el recurrente no tiene razón. Es cierto que en ninguna de las alegaciones de la demanda contra el doctor Ark se plantea la existencia de una controversia relacionada con el consentimiento prestado por el señor Colón Prieto para someterse a la operación por la que se reclama. Tampoco surge de los autos del caso que luego de la presentación de la demanda y dentro del término para solicitar enmiendas a las alegaciones la parte recurrida, haya intentado incluir una reclamación al respecto. Sin embargo, en este caso hubo una enmienda implícita a las alegaciones, conforme a la Regla 13.2 de Procedimiento Civil, 32 L.P.R.A. Ap. III.

En *Vélez Toro v. Látimer*, 125 D.P.R. 109, 111 (1990), indicamos que el propósito de las alegaciones es bosquejar "a grandes rasgos" todas las controversias planteadas en un caso, de modo que la parte contraria sea notificada de las contenciones y reclamaciones que se presentan en su contra para que pueda comparecer a defenderse de lo que se le reclama. No obstante, aun cuando no se incluyan todas las reclamaciones en las alegaciones, la Regla 13.2 de Procedimiento Civil, *supra*, permite que éstas queden enmendadas por la prueba al momento del juicio si la parte contra quien se presenta consiente a ello expresa o implícitamente, o si el tribunal así lo autoriza.

Surge de la misma regla que el consentimiento implícito para enmendar las alegaciones se obtiene cuando la parte contra quien se presenta la evidencia que resulta ajena a las alegaciones no objeta su presentación. Pero cuando el ofrecimiento o la presentación de tal evidencia son objetados, el tribunal sólo autorizará la enmienda a los fines de que se facilite la presentación del caso si determina que la parte que se opone no habrá de sufrir perjuicio en su reclamación o defensa. Por el contrario, si determina que dicha parte habrá de sufrir tal perjuicio, deberá rechazar la evidencia o podrá conceder una posposición para permitir a la parte opositora controvertirla.

En el caso de autos, el recurrente señala que al ofrecerse el testimonio del doctor Martin Stern, objetó rigurosamente a su admisibilidad porque ese estaba relacionado únicamente al asunto de consentimiento informado.(²) Pero antes de que testificara el doctor Stern, el demandante había testificado sobre la información que le brindó el doctor Ark en cuanto a los riesgos y a las consecuencias de la operación de los cordales. Transcripción de evidencia de la vista celebrada el 8 de septiembre de 1987, págs. 21–23. Ante este testimonio, el abogado del demandado sólo presentó una objeción por el fundamento de que el testimonio constituía una prueba de referencia. En ningún momento adujo como fundamento para su objeción que el testimonio trataba sobre prueba ajena a las alegaciones. *Por lo tanto, prestó su consentimiento implícito a que se enmendaran las alegaciones para incluir una reclamación por falta de consentimiento informado.*

En segundo lugar, el recurrente señala que aun si la evidencia sobre la falta de un consentimiento informado fue correctamente admitida, el tribunal erró en la aplicación del derecho. La doctrina de consentimiento informado le impone al médico el deber de informarle a su paciente sobre la naturaleza y los riesgos del tratamiento médico que le propone, de manera que el paciente se encuentre en una posición adecuada para tomar una decisión inteligente e informada. Al discutir las exigencias de dicha doctrina, en *Rodríguez Crespo v. Hernández*, 121 D.P.R. 639 (1988),

---

(²) La parte demandada también objetó la presentación de dicho testimonio, porque la parte demandante no suplementó su contestación a los interrogatorios para notificarle al demandado que había contratado al perito. También objetó porque, aun si dicho perito había hecho una determinación de negligencia, ella fue muchos años después de los hechos. Dicha objeción fue declarada sin lugar por el Tribunal Superior, porque más de dos (2) años antes de la vista, los demandantes presentaron una moción ante el tribunal en la cual le informaron que se había contratado al doctor Stern para que fuera perito en el caso. Nos parece que esta determinación fue acertada, porque la moción presentada por los demandantes cumplió con el propósito de informarle al demandado quiénes serían peritos en el caso, además de que entendemos que el momento cuando fue contratado el perito, si bien podría afectar la credibilidad de su testimonio, no incide sobre su admisibilidad.

y en *Sepúlveda de Arrieta v. Barreto*, 137 D.P.R. 735 (1994), resolvimos que el médico debe divulgarle al paciente los riesgos razonablemente previsibles, así como los beneficios del tratamiento propuesto, las consecuencias probables de no someterse a éste y las alternativas disponibles. No tiene que revelarle riesgos remotos o aquellos riesgos que razonablemente no pueda prever.

La prueba presentada en este caso demuestra que, al obtener el consentimiento del señor Colón Prieto, el doctor Ark no le reveló la existencia de un riesgo de que durante la extracción de los cordales se le cercenara el nervio lingual, a pesar de que dicho riesgo era completamente previsible y de que la práctica prevaleciente de la profesión exigía su revelación. Dicha omisión constituyó una violación a las normas de consentimiento informado. Sin embargo, no fue suficiente para imponer una responsabilidad civil. En casos en que se reclamen daños por la falta de un consentimiento informado, el Art. 1802 del Código Civil, *supra*, exige que, además de demostrar que ha habido un daño y un incumplimiento con el deber de informar, el demandante pruebe que dicho incumplimiento fue lo que le causó el daño. Para demostrar este elemento de causalidad, el demandante tiene que colocar al tribunal en una posición que le permita determinar si en el curso normal de los acontecimientos le era exigible al doctor prever que la falta de información debida llevaría a su paciente a adoptar una decisión distinta a la que tomaría de haber estado adecuadamente informado. *Sepúlveda de Arrieta v. Barreto*, supra págs. 747–748. Es decir, que en los casos como el de autos, en los cuales el consentimiento se estaba solicitando para someter al paciente a una operación para removerle los cordales, el demandante tiene que presentar evidencia que permita al tribunal evaluar cómo se hubiera afectado su decisión de haber conocido el riesgo que no le fue informado y si dicho efecto era previsible desde el punto de vista de su dentista. El demandante en este caso

no aportó la prueba. De hecho, el señor Colón Prieto ni siquiera alegó (mucho menos probó) que si hubiera conocido este riesgo no hubiera consentido a la operación. Por lo tanto, no podemos confirmar la determinación del tribunal de instancia que ordenó al demandado a compensarle a los demandantes por los daños que les causó la falta de un consentimiento informado.

## II

En la sentencia impugnada por el recurrente, el tribunal de instancia determinó que la sintomatología de la que se queja el demandante es resultado de la laceración que sufrió en la lengua; que ésta se la ocasionó el doctor Ark mientras le extraía los cordales, y que "evidentemente" el doctor no ejerció el grado de cuidado, las destrezas y las previsiones que la operación exigía, porque no es usual que en este tipo de operación se ocasionen daños al nervio lingual.

No podemos estar de acuerdo con la inferencia a la que llega el tribunal de instancia. El Art. 1802 del Código Civil, *supra*, le exige a los dentistas las mismas normas mínimas de cuidado, de conocimiento y de destrezas que le exige al resto de la profesión médica. Por lo tanto, la atención que se les requiere es aquella que, a la luz de los modernos medios de comunicación y de enseñanza, y conforme a los conocimientos de la ciencia y las prácticas prevalecientes en la comunidad médica, satisface las exigencias que la propia profesión ha establecido para el tratamiento de enfermedades iguales o parecidas. *Rodríguez Crespo v. Hernández,* supra; Medina Santiago v. Vélez, 120 D.P.R. 380 (1988); *Pérez Torres v. Bladuell Ramos*, 120 D.P.R. 295 (1988); *Ríos Ruiz v. Mark*, 119 D.P.R. 816 (1987); *Oliveros v. Abréu*, 101 D.P.R. 209 (1973). También se exige del dentista que al atender a sus pacientes aplique sus conocimientos y destrezas con el grado de cuidado que se espera

que ejerza un profesional con su misma preparación. *Medina Santiago v. Vélez*, supra.

Al igual que con los demás médicos, al dentista le cobija una presunción de que administró el tratamiento adecuado a su paciente, por lo que le corresponde al demandante presentar evidencia suficiente para demostrar lo contrario. *Medina Santiago v. Vélez*, supra; *Ramos Orengo v. La Capital*, 88 D.P.R. 315 (1963); *Sáez v. Municipio de Ponce*, 84 D.P.R. 535 (1962). Ello requiere que la relación de causalidad y la determinación de negligencia no se establezcan a base de meras especulaciones o conjeturas. La negligencia del médico tampoco se puede presumir por el mero hecho de que el paciente haya sufrido un daño o porque el tratamiento no haya tenido éxito. El demandante tiene que establecer mediante la preponderancia de la evidencia que el daño ocurrido se debió con mayores probabilidades a la negligencia del demandado. Para ello, tiene que presentar prueba pericial sobre las normas mínimas de conocimiento y de cuidado médico aplicables a esta rama de la Medicina; tiene que demostrar que el demandado incumplió con estas normas en el tratamiento del paciente, y demostrar que dicho incumplimiento fue la causa de la lesión que sufrió. *Rodríguez Crespo v. Hernández*, supra; *Medina Santiago v. Vélez*, supra. Esta prueba podrá obviarla sólo cuando la falta de cuidado sea tan evidente como para inferir negligencia. *Quiñones v. Duarte Mendoza*, 112 D.P.R. 223 (1982).

Un análisis cuidadoso de la transcripción de evidencia revela que los demandantes no aportaron la evidencia necesaria para probar que el doctor Ark incurrió en negligencia al extraerle los cordales al señor Colón Prieto. Tampoco surgen circunstancias que nos permitan obviar la presentación de evidencia sobre la negligencia del doctor Ark. De hecho, el propio perito de los demandantes, el doctor Martin Stern, aceptó que la extracción se hizo bajo métodos aceptables y que, a pesar de que el nervio no debía lace-

rarse porque había un diente presente, podía ocurrir aun en las manos más expertas. Transcripción de evidencia, págs. 242–243 y 269.

### III

En cuanto a la negligencia post operatoria, la prueba sí estableció que el doctor Ark debió haberle indicado al señor Colón Prieto que había sufrido una laceración en la lengua y que era recomendable que visitara a un neurocirujano. Al no hacerlo se apartó de las normas exigibles a un dentista. Transcripción de evidencia, págs. 227, 238, 246–247 y 271. Sin embargo, no se estableció el nexo de causalidad entre dicha negligencia y los daños que sufrió y continúa sufriendo el señor Colón Prieto.

Según la evidencia aportada, cuando ocurre este tipo de laceración la práctica prevaleciente es esperar de seis (6) meses a un (1) año antes de hacer intentos por reparar el nervio lingual, porque generalmente el problema se corrige con el paso del tiempo. Es luego de este período que, si la condición persiste, deberá intervenir un neurocirujano para tratar de reparar el nervio. En el caso que nos ocupa, la prueba demostró que dentro de este período de seis (6) meses a un (1) año el señor Colón Prieto visitó a un especialista en cirugía oral por su propia cuenta. Tal como indica el testimonio del doctor Martin Stern, a pesar de que el doctor Ark fue negligente al no referirle a un especialista, "el [sic] paciente de una manera u otra se le estaban [sic] viendo por el problema", por lo que no existe causalidad entre la omisión negligente del doctor y los daños que sufre el señor Colón Prieto. Transcripción de evidencia, pág. 247.

Habiendo determinado que no se estableció responsabilidad alguna por parte del doctor Ark frente al señor Colón Prieto y sus familiares, *no podemos confirmar la sentencia del antiguo Tribunal Superior que condenó al licenciado*

*Géigel a indemnizar a los demandantes. Procede, pues, la revocación de la sentencia dictada por el ilustrado tribunal de instancia.*

Así lo pronunció, manda el Tribunal y certifica la Secretaria del Tribunal Supremo. El Juez Asociado Señor Negrón García emitió una opinión disidente. Los Jueces Asociados Señores Fuster Berlingeri y Corrada Del Río disintieron sin opinión escrita.

*(Fdo.)* Isabel Llompart Zeno
*Secretaria del Tribunal Supremo*

## — O —

Opinión disidente del Juez Asociado Señor Negrón García.

*Constituye una nota irónica que hiere nuestra conciencia judicial* que hoy la sentencia mayoritaria favorezca al Lcdo. Wilfredo A. Géigel, quien —como abogado de Rafael Colón Prieto en el pasado— había asumido una postura totalmente *contraria a la actual, a saber, que el Dr. Phillip R. Ark fue negligente cuando le cortó el nervio lingual al recurrido.* Parafraseando la clásica aseveración de que *justicia tardía no es justicia,* resumimos así nuestra insatisfacción: *injusticia tardía es doble injusticia.*

No podemos suscribir que *un cuarto de siglo después,* sin fundamentos válidos, se exonere de responsabilidad civil *por mala práctica (negligencia) profesional* al doctor Ark y al licenciado Géigel. La propia sentencia mayoritaria reconoce que el doctor Ark *omitió explicarle* a su paciente Colón Prieto el riesgo de una laceración del nervio lingual que conllevaba la extracción de los cuatro cordales bajo *anestesia general, infringiendo así el principio de consentimiento informado*; que en efecto, el 10 de noviembre de 1971, el doctor Ark *le cercenó a nivel de los cordales el nervio arveolar del lado izquierdo,* causándole una *insensibilidad permanente* en la lengua que le ha producido innu-

merables mordidas y heridas sangrantes, constante sensación de quemazón, incomodidad, mala alimentación, insomnio crónico, depresión y otros daños más; que el doctor Ark fue advertido de la situación ese mismo día y desde ese momento, *por más de un año, le ocultó a Colón Prieto la verdadera causa, gravedad y consecuencias de la lesión, demorando así que éste acudiera a tiempo a tratarse con otros especialistas para remediar el daño principal y mitigar sus males secundarios.*

*Decimos injusticia doble*, pues en virtud de las conclusiones erróneas mayoritarias, se libera de responsabilidad al licenciado Géigel, aun cuando la sentencia también acepta —con carácter final y firme— que *dicho abogado incumplió negligentemente con el principio de información y deber de diligencia* en torno al archivo de la demanda original de Colón Prieto contra el doctor Ark presentada el 10 de septiembre de 1973. Caso Civil Núm. 73-3814.

La *injusta sentencia mayoritaria relaja los criterios de excelencia profesional médica y legal a unos niveles inimaginables. Según sus parámetros, resulta sumamente difícil, sino imposible, demostrar la responsabilidad de un médico o abogado por impericia o descuido profesional.*

Expongamos sucintamente los hechos según el elaborado dictamen del Tribunal Superior, Sala de San Juan (Hon. Wilfredo Alicea López, Juez), avalados en una reflexiva aquilatación y un esmerado análisis de la prueba testifical y documental.

## I

Colón Prieto padecía de cuatro (4) cordales impactados. El 28 de octubre de 1971 el cirujano dental doctor Ark le recomendó operárselos. Fue advertido de que después de la operación tendría un dolor temporal, se iba a hinchar y se pondría trinco, pero que en dos (2) o tres (3) días estaría bien. Colón Prieto accedió.

La operación se realizó bajo *anestesia general* el 10 de noviembre en el hospital La Concepción de Mayagüez. Colón Prieto se despertó y recobró totalmente la conciencia a las 4:00 P.M. Tenía dolor en el área de los cordales, estaba muy hinchado, sentía tirantez en la barbilla izquierda y en la cara y *sufría una sensación de quemadura en el lado derecho de la lengua.* Se levantó, fue al baño y, al mirarse la lengua, se percató de que *tenía una laceración en el lado derecho que le ardía mucho y medía como tres cuartos (¾) de pulgada de largo.*

Esa noche le relató esas dolencias al doctor Ark *y le mostró la laceración en la lengua.* El doctor Ark le dijo que posiblemente se había mordido la lengua, pero que ello pasaría; además, le recetó Demerol. Al otro día, Colón Prieto reiteró esas dolencias y el doctor Ark le indicó que con el tiempo desaparecerían.

El 13 de noviembre le dio de alta y para removerle los puntos lo citó a su oficina. Así lo hizo el 17. Durante este período, la inflamación y el dolor en el área de los cordales disminuyeron, pero no el problema de la barbilla y lengua. *Tenía la lengua inflamada e insensible, y la herida abierta; al morderse, sangraba.* El doctor Ark le dijo que había que esperar. No le recetó ningún medicamento y lo citó para el 30 de noviembre. Entre estas fechas se le alivió la hinchazón y ya no estaba trinco. *Sin embargo, continuó la tirantez e insensibilidad en el lado izquierdo de la barbilla.* La mayor molestia y los dolores lo producían la insensibilidad en la lengua, pues se mordía y abría la herida. *Para ese entonces comenzó a padecer y se le desarrolló un problema serio de insomnio.*

El 30, el doctor Ark le recetó cápsulas de Nembutal para dormir y pastillas de Dilantin para el ardor de la lengua. Fijó la cita siguiente para el 14 de diciembre. Subsistieron los mismos problemas: *los medicamentos no produjeron ninguna mejoría.* Para el 14 de diciembre, el área de los cordales había cicatrizado bien, pero el problema de la len-

gua persistía. El doctor Ark no le recetó nada y lo citó para el 13 de enero de 1972. El insomnio se le agudizó y despertó varias veces con la lengua mordida. Al 13 de enero seguía con la insensibilidad en la lengua. El doctor Ark le recetó Oretin para ver si le ayudaba a crecer el nervio de la mandíbula; para el problema de la lengua no le recetó nada y le dijo que tenía que esperar. La cita para febrero fue cancelada por Colón Prieto y transferida para el 15 de marzo. *Ésta fue la última cita de Colón Prieto como paciente del doctor Ark.* Otra vez le relató el mismo problema de la lengua: insensibilidad con sensación de quemadura. El doctor Ark le dijo que esperara cuatro (4) meses y, si continuaba igual, *volviera para cortarle ese pedazo de la lengua. Para ese entonces, el insomnio era crónico y continuaba mordiéndose.*(¹)

Transcurrieron once (11) meses desde la operación —incluyendo los cuatro (4) meses recomendados por el doctor Ark— y Colón Prieto *seguía igual.* Ante el temor real de que el doctor Ark le cortara un pedazo de la lengua, el 13 de octubre de 1972, por propia iniciativa, acudió donde el *dentista*(²) Ricardo Pesquera. Luego de realizarle un historial y examinar unas placas que le envió el doctor Ark con una carta explicativa, el 31 de octubre lo refirió al *especialista,* Dr. Max Ramírez de Arellano, cirujano neurológico. El 10 de noviembre —*al año exacto de la operación*— el doctor Ramírez de Arellano lo examinó y le rindió un informe al doctor Pesquera. Días después, el doctor Pesquera le recetó vitamina B-12 y le dijo que no podía hacer ninguna intervención quirúrgica.

Las vitaminas recetadas por el doctor Pesquera no dieron resultado. A sugerencias del propio Colón Prieto, el doctor Pesquera lo refirió al Dr. Rafael Longo, neuro-

---

(¹) Debido a este problema de salud y a los insomnios, Colón Prieto asistió poco al trabajo. Ello generó fricciones con su socio, quien le dijo que no volviera a trabajar.

(²) La evidencia en autos identifica al doctor Pesquera simplemente como dentista, *no especialista.*

cirujano. Éste, en cita de 24 de noviembre, lo examinó y le recetó Protamide y vitaminas B-12; dichos medicamentos no le mejoraron. Después fue evaluado por el neurocirujano Dr. Nathan Rifkinson, quien le hizo una evaluación neurológica similar a las de los galenos Ramírez de Arellano y Longo. Le recetó pastillas Mysoline, pero tampoco le dieron resultados positivos.

El doctor Pesquera lo refirió al otorrinolaringólogo Dr. Juan H. Font, quien le recetó Noctec y Tegretal, sin éxito.

Para el 12 de julio de 1973, el doctor Pesquera le hizo cita con el Dr. Carlos Valls, cirujano oral, quien lo examinó pero no le recetó. El 26 de septiembre de 1973 visitó al Dr. Marcos A. Dones, cirujano oral en el Hospital Presbiteriano. Dicho médico llegó a la conclusión de que con cirugía no había nada que hacer. Le recetó Kemplex en inyecciones, pero tampoco dieron resultado positivo.

Para 1974, el doctor Pesquera y el señor Colón Prieto concluyeron que habían agotado todas las alternativas en Puerto Rico y decidieron acudir a otros profesionales en Estados Unidos.(³) Después de veinticinco (25) años de la

---

(³) El primero fue el Dr. Alex M. Mohnac, Jefe del Departamento de Medicina Dental de la Universidad de Temple. Fue examinado el 14 de abril de 1974 por el doctor Mohnac y tres (3) médicos más. Le recetó Mincoplex y le prescribió un tratamiento por dos (2) meses, pero no le dio resultados positivos. Después, el doctor Pesquera le consiguió una cita con el Dr. Donald Mulder, Presidente de *Staff*, Clínica Mayo de Nueva York, para el 6 de mayo de 1975. El doctor Mulder lo refirió al Dr. Stanley Lovestedt, cirujano oral. Éste lo examinó y no le recetó nada porque halló que no había forma alguna de corregir su condición de la lengua. El 9 de mayo el doctor Mulder concluyó que no había medicina ni cirugía alguna correctiva.

Nuevamente, Colón Prieto obtuvo una cita con el Dr. Eugene D. Lyon, Jefe de Departamento, Hospital John Hopkins, para el 30 de mayo de 1975. En el ínterin, el 9 de abril de 1975 el doctor Valls le recetó vitamina C, pastillas para dormir y Valium. En la cita con el doctor Lyon, le tomaron placas y un examen previo; éste coincidió con los médicos anteriores y no le recetó nada.

Subsiguientemente, vio al Dr. Walter Guralenick, cirujano oral el 9 de junio de 1975 en el Massachussets General Hospital, Boston. *Llegó a las mismas conclusiones.* También recibió tratamientos el 4, 5, 11 y 12 de junio de 1975, sin mejoría, en el Departamento de Acupuntura del Hospital de Filadelfia.

En 1976 el doctor Pesquera consultó el caso con otros cirujanos orales prominentes: doctor Spatz, Jefe del Departamento de Medicina Dental de la Universidad de Pittsburg, Dr. Daniel E. Waite, cirujano oral en la Universidad de Minnesota, y Dr. Wendell E. Bell, cirujano oral en la Universidad de Texas. *Todos contestaron; los resultados fueron negativos.*

operación y de haber consultado a muchos médicos, incluso cirujanos orales, el problema de la lengua persiste y ha desarrollado una fibrosidad.

Antes de la operación, Colón Prieto y su esposa Nilda González Casañas llevaban una vida normal, compartían la misma habitación, salían con amistades, pasaban fines de semana en San Juan con sus familiares, iban al teatro en San Juan, etc. Luego de la operación, el matrimonio ya no comparte la misma habitación, pues duermen en camas separadas por el problema del insomnio. Consume los alimentos solo para no distraerse y morderse la lengua. Se levanta y desayuna tarde, se siente de mal humor, se pone violento, aborrecido, sus hijos le molestan, han surgido problemas y disgustos en su casa, ya no comparten socialmente. Los viajes a San Juan se acabaron; hay tristeza en el hogar; no hay la unión y paz familiar de antes.

## II

Distinto al criterio mayoritario, la responsabilidad profesional del doctor Ark y, en consecuencia, del licenciado Géigel, se impone según tres (3) fundamentos distintos y separables. Expongámoslos.

### A. *Falta de consentimiento informado*

Correctamente la *sentencia* mayoritaria concluye que la prueba enmendó las alegaciones de la demanda al respecto. Sentencia, págs. 669–671. Además, que se demos-

---

En 1978, Colón Prieto fue a la Clínica Mayo y fue examinado por el doctor Lofler, cirujano oral. Le dijo que no podía hacer nada. En 1985 volvió a dicha Clínica, y el Dr. Don Tollman le indicó que nada podía hacerse. Consultó, además, al doctor Hoffman en dicha clínica y éste lo refirió al *Pain Center*. Fue hospitalizado en el *Sleep Disorder Center* del Hospital Saint Mary, bajo el cuidado del Dr. Richard Son. Le recetó Pretictelina, sin resultado. También fue referido al Departamento de Sicología y atendido por el Sicólogo Schwartz, cuyo tratamiento tampoco le dio resultado.

En Puerto Rico, el doctor Mercado le recetó Dilantin para el problema de la lengua, pero no le alivió el dolor. En noviembre de 1985 fue a Nueva York y se entrevistó con el Dr. Martin Stern, Jefe de Cirugía Oral en la Universidad de Nueva York.

tró que el doctor Ark no le reveló a Colón Prieto la existencia del riesgo de que durante la extracción podía cercenarle el nervio lingual, a pesar de que dicho riesgo era completamente previsible y la buena práctica prevaleciente profesional así lo exigía. "Dicha omisión constituyó una violación a las normas de consentimiento informado." Íd., pág. 671.

Sin embargo, la *sentencia* mayoritaria resuelve que Colón Prieto no demostró causalidad. Aduce que tenía que presentar prueba de cómo se hubiera afectado su decisión de haber conocido el riesgo, cosa que no hizo. Sentencia, pág. 673–674. *Discrepamos.*

Sobre este extremo, debemos aclarar que los autos originales del caso inicial (Caso Civil Núm. 73-3814, *Colón Prieto v. Ark*) fueron objeto de discusión en *conferencia con antelación al juicio* en el caso *que ahora nos ocupa*, Caso Civil Núm. 79-2460, *Colón Prieto v. Géigel.* Ésta fue celebrada por los abogados el 6 de abril de 1981; conforme a su *Acta, éstos convinieron la admisibilidad de aquellos autos originales, "incluyendo interrogatorios y admisiones".* Subsiguientemente, durante el juicio el 4 de marzo de 1987, *presentaron formalmente esos autos originales en evidencia. Exhibit* I, ambas partes. Entre los *interrogatorios* aludidos, cabe destacar la contestación Núm. 37 de Colón Prieto, en la cual —luego de reiterar que el doctor Ark no le advirtió que la remoción de los cordales podía ocasionarle un daño al nervio— consignó que de haberlo hecho, *"nunca me hubiese decidido a operarme en ese mismo momento, al contrario, le hubiese pedido tiempo al Dr. Ark para considerarlo y hubiese acudido a otros especialistas. Es obvio que de haberme advertido de que él podía ocasionarme una lesión de tales consecuencias, yo nunca me hubiese operado de los cordales con el Dr. Ark".* A.O., pág. 69.

*Es incorrecta, pues, la conclusión mayoritaria sobre ausencia de esa prueba.* Al amparo de los lineamientos juris-

prudenciales recogidos en *Sepúlveda de Arrieta v. Barreto*, 137 D.P.R. 735 (1994), se demostró satisfactoriamente el elemento de "causalidad adecuada" entre la omisión informativa del doctor Ark y el daño sufrido por la *falta de consentimiento informado* de Colón Prieto.

## B. *Negligencia durante la operación*

En cuanto a la operación en sí, la sentencia mayoritaria sostiene que Colón Prieto "no aport[ó] la evidencia necesaria para probar que el doctor Ark incurrió en negligencia al extraerle los cordales ...". Sentencia, pág. 673. Inmediatamente afirma que, "[t]ampoco *surgen circunstancias que nos permitan* obviar la presentación de evidencia sobre la negligencia del doctor Ark". (Énfasis suplido.) Íd. *Ambas conclusiones son totalmente erróneas.*

*Primero*, la mayoría *ignora* el testimonio no contradicho del cualificado perito neurólogo Dr. Boris Rojas Rodríguez, quien contundentemente estableció *que el evento que con mayor probabilidad causó la lesión al nervio arveolar fue "la cirugía de los cordales"*. T.E., págs. 90–92, 154–156 y 159. Dicho perito descartó, por ser físicamente imposible —"esto es *increíble*"— *la versión de mordida autoinfligida*, que fue promovida desde el principio por el doctor Ark. Como explicó el doctor Rojas Rodríguez, *por estar el nervio lingual atrás*, "tendría que morderse un sitio que ningún ser humano podía morderse". T.E., pág. 172.

Esa prueba, unida al testimonio pericial del doctor Martin Stern (T.E., pág. 239) —que le mereció entero crédito al ilustrado tribunal de instancia— estableció concluyentemente que toda la sintomatología que ha aquejado a Colón Prieto desde la operación provino de la laceración de la lengua ocasionada por las manos del doctor Ark mientras le extraía los cordales bajo anestesia general.

La sentencia mayoritaria trata de refutar esta realidad enfatizando que, en su testimonio, el doctor Martin Stern contestó que la laceración "podía ocurrir aun en las manos

más expertas". T.E., págs. 242, 243 y 269. *El argumento no es persuasivo.* Olvida que aun las manos "más expertas" de un cirujano pueden ser descuidadas y, ciertamente, no se probó que las del doctor Ark tuvieran aquellas cualidades.

Nuestra jurisprudencia sobre la impericia médica sólo exige que el actor demuestre, mediante preponderancia de la prueba, que la conducta negligente del demandado fue el factor que con mayor probabilidad causó el daño. *Castro Ortiz v. Mun. de Carolina,* 134 D.P.R. 783 (1993); *Pagán Rivera v. Mun. de Vega Alta,* 127 D.P.R. 538 (1990); *Torres Ortiz v. Plá,* 123 D.P.R. 637 (1989); *Rodríguez Crespo v. Hernández,* 121 D.P.R. 639 (1988); *Pérez Cruz v. Hosp. La Concepción,* 115 D.P.R. 721, 740 (1984); *Cruz v. Centro Médico de P.R.,* 113 D.P.R. 719, 745 (1983). *Colón Prieto satisfizo esta medida ("test") y probó la negligencia durante la operación.*

*Segundo,* reconocemos que el aquí *directamente* demandado es el licenciado Géigel, y Colón Prieto tiene que probar que tenía una causa de acción válida contra el doctor Ark, malograda por la negligencia del licenciado Géigel.

> ... Esta exigencia peculiar, de perfiles propios, denominada por los tratadistas "un caso dentro del caso" significa que "el cliente debe establecer que él debió ganar el primer caso como paso previo para ganar el segundo". J. Wade, [*The Attorney's Liability for Negligence,* en T.G. Roady y W.R. Andersen, *Professional Negligence,* Tennessee, Vanderbilt U.] Press, 1960, pág. 231.
>
> La necesidad de litigar el caso previo alegadamente frustrado para abrir las puertas al segundo implica ventilar todos los puntos y elementos clásicos de un proceso ordinario, con la única variante que, de hallarse probada la causa original, no podrá exigirse de la parte culposa resarcimiento. Simplemente habrá terminado el prólogo del proceso para entonces comenzar la segunda etapa e intentar establecer la responsabilidad del abogado. *Colón Prieto v. Géigel,* 115 D.P.R. 232, 242–243 (1984).

*La justicia es una avenida en dos (2) direcciones.* Del mismo modo que el licenciado Géigel presentó numerosas defensas que propiamente correspondían al doctor Ark

—precisamente adujo que la demanda original contra el doctor Ark estaba *prescrita*, planteamiento resuelto en su contra en *Colón Prieto v. Géigel*, supra— en recta lógica Colón Prieto pudo beneficiarse y el ilustrado tribunal de instancia justicieramente aplicar al caso de autos la *doctrina de "res ipsa loquitur"*.[4] Expongamos sus contornos.

Como regla general, corresponde a todo demandante probar la actuación negligente de un médico demandado. La doctrina *res ipsa loquitur*, por excepción, *traslada* el peso de la prueba al médico, quien entonces debe demostrar que no actuó de forma negligente. "[D]ispone que una vez el demandante establece los hechos que justifican su aplicación queda relevado de probar la negligencia del demandado, surgiendo en su lugar una inferencia permisible que pasa al demandado el peso de continuar con la prueba, quien debe demostrar que empleó el debido cuidado." H. Brau del Toro, *Daños y perjuicios extracontractuales de Puerto Rico*, 2da ed. rev., San Juan, Pubs. J.T.S., 1986, Vol. I, págs. 395–396.

Su aplicación requiere establecer los requisitos siguientes: (1) la existencia y las circunstancias según las cuales se produjo un daño; (2) que éste no ocurra en el curso ordinario de los eventos a no ser por la *negligencia de otra persona que tenga el control exclusivo de la causa del daño*; (3) que circunstancialmente pueda inferirse de forma razonable que, de no haber sido por la negligencia del demandado, el daño no hubiese ocurrido; (4) la prueba pericial

---

[4] En su elaborada sentencia, dicho foro concluyó:

"La prueba que le mereció entero crédito al Tribunal demuestra que toda la sintomatología de que se queja el demandante le proviene de la laceración de la lengua y que ésta se la ocasionó el doctor Ark mientras le extraía los cordales. Si al llevar a cabo dicha extracción el doctor Ark le ocasionó al demandante la referida laceración, *evidentemente que no ejerció el grado de cuidado, las destrezas y previsiones que la operación requería, pues no es usual que en operaciones de tal naturaleza se ocasionen lesiones al nervio lingual.* La prueba aportada por la parte demandante, que no fue desmentida ni impugnada por la parte demandada, demuestra que en operaciones de los cordales no son frecuentes las lesiones al nervio lingual. *Es decir, la falta de cuidado del Dr. Ark fue tan evidente, que la misma es suficiente para inferir que incurrió en negligencia mientras llevaba a cabo la extracción de los cordales."* (Énfasis suplido.) Sentencia final, pág. 18.

para demostrar las causas del daño está bajo el control del demandado; (5) el daño no debe ocurrir por acción voluntaria del demandante, y (6) la inexistencia de otra causa probable del daño de la cual pueda inferirse que no hubo negligencia por parte del demandado. *Soc. de Gananciales, etc. v. Presbyterian Hosp.*, 88 D.P.R. 391 (1963); *Hermida v. Feliciano*, 62 D.P.R. 55 (1943). Véanse: *Vda. de Torres v. Womble*, 99 D.P.R. 859 (1971); *Ramos Orengo v. La Capital*, 88 D.P.R. 315 (1963). Este último caso ejemplariza las situaciones específicas siguientes que no requieren prueba pericial para invocarla: (1) objetos dejados dentro del cuerpo; (2) *daño causado a una parte sana del cuerpo*; (3) *remoción de una parte sana del cuerpo*, y (4) dientes dejados por la tráquea del paciente, entre otros. J. Cuevas Segarra, *Res Ipsa Loquitur y los casos de impericia médica*, 7 (Núm. 3) Forum 22-23 (julio-septiembre 1991).

Bajo este sucinto análisis, el caso de autos es uno clásico al cual le aplica la doctrina *res ipsa loquitur. Primero,* Colón Prieto sufrió un daño: la cortadura del nervio lingual que le insensibilizó la lengua y causó que se la mordiera y lacerara. Esta laceración le produjo una sensación de ardor y tirantez en la lengua, y otras lesiones posteriores. Antes de la operación, su lengua y sensibilidad era normales. Indiscutiblemente, el daño lo produjo el doctor Ark al extraer los cordales: le cortó el nervio durante la intervención. *Segundo,* aunque probable, la cortadura de dicho nervio es un evento que *ordinariamente no sucede* (ni debe suceder) en una operación de cordales. En vista de que el daño ocurrió durante la operación, *estando Colón Prieto anestesiado,* el doctor Ark tenía el *control exclusivo* de la situación. *Tercero,* si el doctor Ark no hubiese cortado el nervio lingual, el paciente no se hubiese mordido ni lacerado la lengua. *Cuarto,* Colón Prieto en nada contribuyó al daño, pues se encontraba anestesiado. *Aunque después, al morderse se laceró la lengua; esto fue en reacción al daño inicial ocasionado por el médico al darle muerte al nervio.* Es decir,

cuando Colón Prieto se mordió la lengua, el daño ya existía.

En virtud de la doctrina de *res ipsa loquitur, se activó una inferencia de negligencia del doctor Ark. Para rebatirla* tenía que presentar prueba para establecer que actuó con el debido cuidado y demostrar que la laceración y demás lesiones no fueron causadas por haberle cortado el nervio de la lengua a Colón Prieto. *No lo hizo; el daño habla por sí solo y su negligencia es incuestionable.*

## C. *Negligencia post operatoria*

Aparte de haberse probado la *negligencia* durante la extracción —*por el testimonio pericial directo* y la aplicación de la doctrina de *res ipsa loquitur*— la sentencia mayoritaria *acepta que posteriormente el doctor Ark se apartó de las normas exigentes a los dentistas al nunca indicarle a Colón Prieto que le había lacerado el nervio lingual y que debía visitar a un neurocirujano.* Sentencia, pág. 13. Aun así, nuevamente lo eximen de responsabilidad al amparo de la tesis de que no estableció un nexo de causalidad entre dicha negligencia y los daños que sufrió y continúa sufriendo. La mayoría se fundamenta en que la prueba demostró que la práctica médica es esperar de seis (6) a un (1) año antes de intentar reparar un nervio lingual y Colón Prieto, por su cuenta, visitó a un *especialista* "dentro de este período". Íd., pág. 674. *Incide otra vez.*

*Primero*, el perito, doctor Martin Stern, aclaró que el término de seis (6) a un (1) año era "un tiempo límite". O sea, "*sería el tiempo ideal para reparar el nervio*, pero hasta este tiempo era apropiado observar al paciente". T.E., págs. 246–247.

Así aclarado, quedó demostrado que desde el principio el doctor Ark *ocultó a Colón Prieto la verdadera causa de la laceración: su propio descuido.* Durante los primeros cuatro (4) meses le dijo que los síntomas eran "normales". Pasados esos cuatro (4) meses, le informó que esperara cuatro

(4) más y le advirtió la posibilidad de cortarle un pedazo de la lengua. Atemorizado, Colón Prieto decidió acudir donde el *dentista* doctor Pesquera *a los once (11) meses de la operación*. Todavía el doctor Ark, en su carta de 19 de octubre de 1972 —*once (11) meses después de la operación*— al remitirle al doctor Pesquera las placas de Rayos X, continuaba insistiendo en su increíble versión de que *"en el salón de recuperación el paciente* [Colón Prieto] *aparentemente se mordió el área anterior derecha de la lengua"*. (Traducción nuestra y énfasis en el original.)

Ante esta situación, el doctor Pesquera, que *no era un especialista*, prudencialmente lo refirió al neurocirujano Ramírez de Arellano el 10 de noviembre de 1972, o sea, *al año exacto de la operación.*

Con vista a esta cronología, ¿cómo puede la mayoría premiar la omisión (por no decir mentira) del doctor Ark y concluir que no existe causalidad en los daños posteriores que aquejan a Colón Prieto?

Dieciocho (18) años después, el 17 de diciembre de 1990, en su testimonio judicial —no obstante existir un consenso unánime en contrario de múltiples especialistas en y fuera de Puerto Rico— reiteraba lo *imposible*: que el corte de nervio no fue con sus manos durante la operación, sino resultado de *una mordida autoinfligida.* T.E., págs. 125–126.

### III

En resumen, el tribunal a quo determinó que el doctor Ark, como dentista, incurrió en impericia profesional y causó un daño que hubiese justificado la imposición de responsabilidad civil. Correctamente expuso que el Art. 1802 del Código Civil, 31 L.P.R.A. sec. 5141, impone a los odontólogos un deber profesional idéntico al resto de la clase médica en general, lo cual conlleva ofrecer aquella atención que, a la luz de los medios modernos de comunicación

y de conocimiento de la ciencia, satisface las exigencias que la profesión reconoce para el tratamiento de padecimientos similares. *Medina Santiago v. Vélez*, 120 D.P.R. 380 (1988). Coincidimos plenamente. Al tribunal de instancia también *le mereció entero crédito* la prueba ofrecida por Colón Prieto de que todos sus padecimientos se han debido a la laceración de la lengua por el doctor Ark. Éste, luego de ampararse en la confianza depositádale, atribuyó tal laceración a un *imposible*: una mordida autoinfligida que eventualmente sanaría. No fue así. Esa demora produjo, incluso, la advertencia de que sería necesario cortarle un pedazo de lengua.

*No existen fundamentos válidos para variar la conclusión de la ilustrada sala sentenciadora de que el doctor Ark incurrió en un acto de impericia que generó, a su vez, una causa de acción meritoria a favor de Colón Prieto, y por ende, el licenciado Géigel es responsable.*

## IV

Finalmente, los argumentos del licenciado Géigel en torno al señalamiento de error —evaluación en sesenta mil dólares ($60,000), más intereses, de los padecimientos de Colón Prieto y su esposa Nilda— no ameritan una mayor consideración. *Si acaso, el ilustrado tribunal de instancia los estimó moderadamente.*

La discusión que hace en el último señalamiento denota precisamente la temeridad que justificó la condena de ocho mil dólares ($8,000) por honorarios de abogado.[5] Basta con señalar el lento y costoso peregrinaje judicial de Colón Prieto, que incluye el recurso de revisión de 1984 y la dilucidación en sus méritos, con prueba testifical y pericial,

---

[5] *Ramos Báez v. Bossolo López*, 143 D.P.R. 567 (1997); *Méndez v. Morales*, 142 D.P.R. 26 (1996); *Oliveras, Inc. v. Universal Ins. Co.*, 141 D.P.R. 900 (1996); *Corpak, Art Printing v. Ramallo Brothers*, 125 D.P.R. 724 (1990), y casos allí citados.

de "dos (2) casos": el primero para demostrar la mala práctica del doctor Ark y, el segundo, la del licenciado Géigel.

Como abogado, el licenciado Géigel tenía conocimiento del estado de derecho al celebrarse las vistas del caso en su fondo —8 y 9 de septiembre, 15 y 17 de diciembre de 1987 y 2 de marzo de 1988— que culminaron con la justiciera y balanceada sentencia del tribunal de primera instancia. No puede ahora quejarse.

*Es lamentable que la mayoría, infundada e injustificadamente, la revoque.*

